206 So.2d 861

Robert C. HUFF

v.

**VULCAN LIFE AND ACCIDENT IN-
SURANCE COMPANY.**

**5 Div. 847.**

Supreme Court of Alabama.

Jan. 11, 1968.

Rehearing Denied Feb. 15, 1968.

John F. Dillon IV, Wilbanks, Wilbanks
& Dillon, Alexander City, for appellant.

Tom Radney, Alexander City and Brown, Pointer & Pointer, Birmingham, for appellee.

MERRILL, Justice.

Appellant sued on an insurance policy for the loss of a hand. At the conclusion of appellant's evidence, the trial court gave the general affirmative charge with hypothesis for the defendant. A motion for a new trial was overruled and plaintiff appealed.

The appellant borrowed some money from the Bank of Dadeville in September, 1964. In connection with the loan, he and the bank took out $5,000 of insurance from the appellee. Among the risks covered was the "* * * Permanent and irrecoverable loss * * * of one or both entire hands by severance or amputation at or above the wrist, provided such loss results from, and within 90 days after, injury caused solely by external, violent and accidental means. * * *."

On March 1, 1965, while the insurance was in force, appellant was working in the woods with a power saw and a falling tree kicked back driving the saw into his forearm. The saw tore and cut the muscles and bones of the arm, leaving only a little portion of skin remaining on the under part of the arm to connect the two portions of the arm. He carried the dangling portion of the arm in his right hand to the hospital in Dadeville, where he was seen by Dr. Jack Brock, who sent him immediately to an eminently qualified orthopedic surgeon, Dr. Jack Hughston, at Columbus, Georgia. Dr. Hughston tried to save the dangling portion of the arm by threading the bones on some steel rods, taking out all the muscles because they were dead, closing the skin as well as he could and putting the arm in a cast. The blood supply to the hand portion of the arm was restored, but appellant could not move any fingers of his left hand and had no feeling in any of the fingers except a slight sensation in the little finger. Dr. Hughston said that he did not hope to retain for appellant "a functional hand" but was hoping to obtain a flesh hook, with some sensation to it

rather than a metal hook. However, the portions did not unite and the lower forearm and hand were amputated in October, 1965, more than ninety days from the date of the accident.

The case was tried on a single count, claiming damages for the loss of the left hand under the policy because "on to-wit: March 1, 1965 plaintiff, Robert C. Huff, lost his hand by severance at or above the wrist." Plea 1 was the general issue, and the next six pleas raised the point that the injury occurred on March 1 and it was not until October 5 that Huff's hand was severed (Pleas 2, 3, 4) or amputated (Pleas 5, 6, 7).

When the plaintiff rested the defendant rested and the defendant requested the general affirmative charge with hypothesis. The trial court heard arguments out of the presence of the jury. When the jury was recalled, he read a few rules for construing insurance contracts from Alabama Farm Bureau Mut. Cas. Ins. Co. v. Goodman 279 Ala. 538, 188 So.2d 268 [5–9] [10], and then charged as follows:

"* * * The Court construes the word 'severance' as meaning a separation, an entire separation, gentlemen of the jury; because Webster's dictionary says that 'severance means a separation by violence.' You heard the evidence in this case. It is elementary that when an insurance company writes an exclusion in a liability policy it intends to limit or exclude a risk. So, as the Court understands the law, Gentlemen of the jury, there was a contract here not based on the loss of the use of the hand, but based on a severance; which means, as the Court understands the law, a complete severance of the limb from the body, from the arm. Therefore, the Court cannot, according to the decision of the Supreme Court, add to or take from. The Court would like very much to see this Plaintiff recover, I will say that much. As a matter of right, if he is entitled to do so under

the law. But since I have to construe it, that is my construction, as I understand the law, in the face of this recent decision of the Supreme Court. So I am giving you the affirmative charge requested by the Defendant. * * *"

It will be noted that the only reason given by the learned trial judge for giving the charge was his construction of the word "severance" as "an entire separation" or a *complete* severance from the body or the upper arm. We agree that Webster's New International Dictionary defines "sever," inter alia, as meaning "disunite," "dissociate," "to open," "to cut or break open or apart." But there is not the finality in every definition of the word severance as there is to the word "amputation." And if the two words —"severance" and "amputation" mean the same, there was no need for the insurance policy to use the phrase "loss of one or both entire hands by severance or amputation at or above the wrist."

Dr. Hughston testified as to his understanding of the meaning of the word "severance," and the difference between "severance" and "amputation." On cross examination by defendant, he was asked if, in bone surgery, there was a difference in the words or were they synonymous:

"A I don't know how to answer you specifically. One way, you can interpret the word 'severance', and it could mean that the bone was broken or severed or cut across; that would be a severance of the bone, and that would not be an amputation. An amputation would mean cutting it off and that there was no bone distal to that point. Do you follow me? You could say that the whole forearm was severed, still that doesn't mean anything except that it was cut, is the way that I interpret it.

"Q Severance to you doesn't mean that it is separated from?

"A No, it doesn't. It means if you severed the skin, cut the skin, the two

skin edges were separated from one another. If you severed the bone, it would mean that you had cut the bone, but that doesn't mean that you can't have some possibility of the bone growing back together. It is not the same thing as an amputation to me.

"Q You can have a loss of bone without an amputation?

"A You can have a loss of bone without an amputation."

The attitude of this court in dealing with the word "severance" in policies similar to the one here was set in Life & Casualty Ins. Co. v. Peacock, 220 Ala. 104, 124 So. 229, where the policy afforded coverage if "the insured shall lose by *severance* both hands, or both feet, * * *." The insured lost her left foot by amputation and the toes of her right foot. The insured was awarded compensation for the loss of both feet and the insurer contended that there was a variance because only one foot was lost. This court said that "the insured is not limited to a recovery by showing that both feet have been entirely severed and lost. The provision for indemnity for 'loss by severance' of feet or hands was intended to refer to the manner rather than to the exact physical extent of the injury." After citing cases from other jurisdictions, the court further stated:

"These cases establish the proposition that, where the policy insures against the loss of a member, or the loss of an entire member, the word 'loss' should be construed to mean the destruction of the usefulness of that member, or the entire member, for the purpose to which, in its normal condition, it is susceptible to application, in the absence of more specific definition in the policy."

See Jones v. Continental Casualty Co., 189 Iowa 678, 179 N.W. 203, 18 A.L.R. 1329, which also follows cases cited in *Peacock,* 220 Ala. 104, 124 So. 229, and has been cited and followed in other jurisdictions. In the *Jones* case, although

the policy defined "Loss" as a "complete severance at or above the wrist or ankle," it was held that the question of whether the plaintiff lost his foot by severance at the ankle was for the jury even though the undisputed evidence was that part of the foot was not amputated.

In King v. Metropolitan Life Ins. Co., 20 Tenn.App. 246, 97 S.W.2d 651, the policy covered loss of one hand by severance at or above the wrist joint. King's left hand came in contact with a rip saw and was almost entirely cut off near the wrist, the only connection retained being a little skin on the under side. There, the hand was saved but it was only half its normal size and King had no use of the hand at the time of trial. The court said on the question of severance:

"* * * In the case under review the hand was practically severed at the wrist and was hanging only by the skin and a small amount of flesh, and it might be compared to a felling of a tree by a trespasser, when the falling trunk of the tree was attached to the stump by an unsevered fragment. In such a case would the court excuse the trespasser from his wrong on the theory that there had been no severance from the realty? The court thinks in such a case there was a severance within the laws of trespass, and that here there was a substantial severance within the terms of the contract. The severance, to an extent, has been repaired due to the skillfulness of the surgeon, but the entire loss of the hand was sustained by reason of the severance."

We quote the following from the testimony of the two doctors. The questions do not necessarily follow each other but are extracted from the record:

### Dr. Brock

"Q Dr. Brock, in your professional opinion, based upon your examination of Robert C. Huff on March 1, 1965, did he, in your opinion, sustain a permanent

and irrecoverable destruction of the entire normal and customary usefulness of his left hand?

"A In my opinion, he did sustain such injury on this date.

"Q Doctor, was there a substantial severance of the major portion of his arm on March 1?

"A Yes, sir, there was."

### Dr. Hughston

"Q Doctor, in your opinion, was the left hand at or above the wrist of Robert C. Huff on March 1, 1965, for all practical purposes entirely traumatically amputated or severed?

"A I would say that the arm was—there wasn't any—much of a chance of saving it. For practical purposes you could consider it as being amputated. At the same time, the one factor that allows you to have a chance to save it was still present, that was the blood supply. So that is the reason for trying to fight for it.

"Q But for all practical purposes it was severed?

"A For practical purposes, it was, yes, sir.

"Q Was there a permanent and irrecoverable loss as of that date?

"A Oh, yes, sure. We anticipated at the most,—that the most we could gain from saving it, if we were able to save it at all, would be that he would have a hook there that would have some sensation to it, which is better than a steel hook that has no sensation to it. There wasn't any anticipation of being able to recover any real function to the hand, because he had lost all the muscles, front and back, all the muscles that move all the fingers and everything.

"Q Based upon the history given and your examination, Doctor, in your opinion, did this traumatic amputation or severance of Robert's entire hand and portion of his arm as you have described on March 1, 1965, result from the accident described to you?

"A Yes, sir.

"Q He suffered a complete loss of the usefulness of his arm at the time of the accident?

"A Yes, sir."

■ We hold that under the cases we have cited and the testimony that the question of whether appellant suffered the loss of his hand by severance on March 1, 1965 was, at least, a question for the jury.

But appellee argues that the court ruled correctly because the hand was not actually amputated within ninety days from March 1, the date of the injury. There is a split of authority on this question but we discuss only two cases, one from Louisiana and one from Mississippi. Other cases are mentioned in Annotation 87 A.L.R.2d 511, § 7(b).

In Westenhover v. Life & Casualty Ins. Co., La.App., 27 So.2d 391, the plaintiff's leg was crushed on August 24, 1945, and the leg was amputated between the knee and thigh on November 2, 1945. The policy provided that no sum would be payable for the loss of any member except for total and permanent severance at or above the ankle or wrist joints, and that no payment would be made unless the loss of the member "occurs within thirty days from the date of the accident." The insurer denied liability because the amputation took place more than sixty days after the accident. The Louisiana Court of Appeals said:

"The provision of the policy at issue does not restrict the meaning of the *loss* of a member to amputation. It simply restricts liability for payment for the loss of a member to those cases in which such loss has been evidenced by amputation. Nor does the policy require that amputation, total and permanent severance, take place within thirty days, but

simply that the *loss* of the member shall occur within thirty days from the date of the accident.

\*   \*   \*   \*   \*   \*

"The insured, under the terms of the policy under examination, cannot be penalized simply because his physicians attempted to prevent the necessity for amputation of his leg. The leg was 'lost' from and after the accident, therefore the requirement for the occurrence of loss within the thirty-day period was fully met, and the fact that the amputation was made sometime after the expiration of this period is of no importance."

In Interstate Life & Accident Co. v. Waters, 213 Miss. 265, 56 So.2d 493, the plaintiff's leg was crushed above the ankle and the policy covered "the loss by severance at or above the ankle," but provided that no indemnity would be paid for loss of a member where the loss did not "occur within 30 days from the date of the accident." The court affirmed a directed verdict for the insured, holding that the policy did not require severance of the member within thirty days, but only that the loss must occur within such time, even though the amputation might not occur until later, and that the loss followed as the immediate result of the accident and, interpreting the policy reasonably and sensibly, the fact that the amputation was *postponed* more than thirty days to avoid the risk of killing the insured, did not relieve the insurer from liability.

We quote again from the pertinent provision of the policy before us. The coverage was for " \*   \*   \* Permanent and irrecoverable loss \*   \*   \* of one or both entire hands by severance or amputation at or above the wrist, provided such loss results from, and within 90 days after, injury caused solely by external, violent and accidental means, \*   \*   \*."

The loss by severance occurred the moment of the accident and on this point the doctors agree. Had the surgeon's efforts to save the hand prevailed, the insured would have had only a flesh hook, which could never function as or serve the purpose of a hand. To force an insured to have a member amputated within a specific number of days in order to be indemnified for his loss, when his doctors are doing their best to save the member or a part of it is neither reasonable nor sensible to us, when it is clearly the *loss* and not a specified time of amputation that is covered by the policy.

We concur with the Louisiana court that the hand was "lost" from and after the accident, and the requirement for the occurrence of loss within the ninety-day period was fully met, and the fact that the amputation was made sometime after the period in which the loss must occur does not destroy the coverage.

In view of our construction of the word "severance" in the policy, it is plain that appellee was not entitled to the requested affirmative charge with hypothesis either on the plea of the general issue or the special pleas. We think a jury question was presented from the testimony of Dr. Hughston. On direct examination, he testified as has already been shown:

"Q Doctor, in your opinion, was the left hand at or above the wrist of Robert C. Huff on March 1, 1965, for all practical purposes entirely traumatically amputated or severed?

"A I would say that the arm was— \*   \*   \*."

On cross examination, he testified that the hand was amputated on October 5, 1965.

In civil cases, the question must go to the jury if the evidence arising therefrom furnishes a scintilla in support of the theory on which the case was tried. Glass v. Davison, 276 Ala. 328, 161 So.2d 811; Southern Apartments, Inc. v. Emmett, 269 Ala. 584, 114 So.2d 453. A conflicting tendency of the evidence making a question for the jury may be presented by the direct

and cross examination of one witness. Parkinson v. Hudson, 265 Ala. 4, 88 So.2d 793, and cases there cited.

The judgment of the circuit court is reversed and the cause is remanded.

Reversed and remanded.

LAWSON, SIMPSON and HARWOOD, JJ., concur.