Burne, Appellant, *v*. Franklin Life Insurance Company.

Argued April 28, 1971; reargument November 16, 1972.   Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Joseph E. Gallagher*, with him *O'Malley, Morgan, Bour & Gallagher*, for appellant.

*J. Charles Hanahue,* with him *Warren, Hill, Henkelman & McMenamin,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, March 16, 1973:

This is an appeal from the order of the Court of Common Pleas of Lackawanna County denying plaintiff-appellant's motion for summary judgment and from the judgment entered below in favor of defendant-insurance company, upon said defendant's motion for summary judgment. The action below, in assumpsit, was for the recovery of the accidental (double indemnity) death benefits of a life insurance policy, of which appellant is the beneficiary. For the reasons set out below, we reverse.

In 1949, defendant-appellee issued to the insured (appellant's husband) a life insurance policy in the face amount of $15,000. The policy also contained a double indemnity proviso for an additional $15,000 if the death of the insured resulted from purely accidental means. This double indemnity provision, and the exceptions contained therein, are the subject of this appeal.

On January 30, 1959, while the policy was in effect, the insured Bartholomew Burne, was struck by an automobile while crossing a street in North Miami, Florida. Immediate and extensive brain surgery was required. From the moment of the accident until his death, Mr. Burne's existence was that of a complete and hopeless invalid, unable to speak, subject to seizures and requiring constant nursing and medical care. Vast sums of money were expended by appellant, and the most sophisticated medical techniques utilized, merely to keep her husband medically alive, albeit in a vegetative state, for 4½ years.[1] It is conceded by the appel-

---

[1] It is not inappropriate to observe, in view of this record, that the insurance carrier suffered no prejudice by the retention of the double indemnity death proceeds for these additional 4½ years.

lee insurance company that the injuries sustained were the direct and sole cause of the insured's death. Appellee paid the face amount of the policy, but refused to pay the accidental death benefits.

The life insurance policy under consideration provides for double indemnity liability for death resulting from accident. However, the policy states that such accidental death benefits will be payable only if ". . . such death occurred . . . within ninety days from the date of the accident." One further exception in the double indemnity rider provides: "This Accidental Death Benefit shall not be payable * * * (10) if the death of the insured shall occur while any premium is being waived under any disability benefit attached to or incorporated in said policy. * * *" (It should be noted, however, that under the policy, no premiums are waived until the insured furnishes proof to the company that the insured has been totally incapacitated for at least six months.) On the basis of these exceptions, the trial court, en banc, granted defendant-appellee's motion for summary judgment. This appeal challenges the validity of these exceptions as applied to the facts of the instant case.[2]

There are strong public policy reasons which militate against the enforceability of the ninety day limitation. The provision has its origins at a much earlier stage of medicine. Accordingly, the leading case construing the provision predates three decades of progress

What appears in fact is that the appellee enjoyed an economic benefit by having the use of these funds during that period, rather than having to pay out that sum at or near the time of the accident.

[2] Appellant also alleges that "the policy gave undue prominence to the accidental death benefit without corresponding prominence to the ninety-day limitation period", in contravention of Section 617(A) (4) of The Insurance Company Law of 1921, Act of May 17, 1921, P. L. 682, art. VI, §617, as amended, 40 P.S. §752(A)(4). In view of our disposition, we need not pass upon this claim.

in the field of curative medicine. Advancements made during that period have enabled the medical profession to become startlingly adept at delaying death for indeterminate periods. Physicians and surgeons now stand at the very citadel of death, possessing the awesome responsibility of sometimes deciding whether and what measure should be used to prolong, even though momentarily, an individual's life. The legal and ethical issues attending such deliberations are gravely complex.[3]

The result reached by the trial court presents a gruesome paradox indeed—it would permit double indemnity recovery for the death of an accident victim who dies instantly or within ninety days of an accident, but would deny such recovery for the death of an accident victim who endures the agony of prolonged illness, suffers longer, and necessitates greater expense by his family in hopes of sustaining life even momentarily beyond the ninety day period. To predicate liability under a life insurance policy upon death occurring only on or prior to a specific date, while denying policy recovery if death occurs after that fixed date, offends the basic concepts and fundamental objectives of life insurance and is contrary to public policy. Hence, the ninety day limitation is unenforceable.

All must recognize the mental anguish that quite naturally accompanies these tragic occurrences. Surely that anguish ought not to be aggravated in cases of this kind with concerns of whether the moment of death permits or defeats the double indemnity claim. So too,

---

[3] For general discussions of the legal and ethical problems surrounding euthanasia see Symposium—The Medical, Moral, and Legal Implications of Recent Medical Advances, 13 Vill. L. Rev. 732 (1968); Silving, Euthanasia: A Study in Comparative Criminal Law, 103 U. Pa. L. Rev. 350 (1954). The purpose of this opinion is not to introduce this controversy into the area of life insurance policies but to forestall it.

the decisions as to what medical treatment should be accorded an accident victim should be unhampered by considerations which might have a tendency to encourage something less than the maximum medical care on penalty of financial loss if such care succeeds in extending life beyond the 90th day. All such factors should, wherever possible, be removed from the antiseptic halls of the hospital. Rejection of the arbitrary ninety day provision does exactly that.

Aside from considerations of public policy, the ninety day provision possesses no persuasive decisional support. In granting appellee's motion for summary judgment, the trial court obviously relied upon a single thirty year old case, *Sidebothom v. Metropolitan Life Insurance Co.*, 339 Pa. 124, 14 A. 2d 131 (1940). That case, as well as virtually every other case which construed a ninety day limitation provision,[4] is based on considerations which have no pragmatic applicability to the factual situation here. The earlier judicial interpretation of the ninety day provision was that its underlying purpose was to govern situations where there existed some possible uncertainty over whether injuries sustained in an accident would actually result in death. The ninety day provision attempted to delineate a line governing cases where the injuries may or may not

---

[4] The leading cases concerning the ninety day provision have assumed that if death is to be the result of an accident it will manifest itself within ninety days. Each of these cases dealt with the type of injuries where there was inherent uncertainty as to whether death would in fact ensue. *Brown v. United States Casualty Co.*, 95 Fed. 935 (1899) (insured suffered injuries from being thrown from dog cart) ; *Kerns v. Aetna Life Ins. Co.*, 291 Fed. 289 (8th Cir. 1923) (piece of metal dislodged from esophagus while pushing car) ; *Barnett v. Travelers' Ins. Co. of Hartford, Conn.*, 32 F. 2d 479 (8th Cir. 1929) (artery accidently cut during nose operation) ; *Spaunhorst v. Equitable Life Assur. Soc.*, 88 F. 2d 849 (8th Cir. 1937) (stab wound suddenly became virulent).

cause death. Ninety days was the arbitrary period advanced by the carrier within which to ascertain whether death will in fact result from the accident.

The factual situation in *Sidebothom* is illustrative of the principles underlying a ninety day provision. There the insured suffered injuries from two different exposures to carbon monoxide. While in the hospital he suffered further injuries from a fall from a hospital bed. In two crucial ways that case is distinguishable from the instant one. First, the injury involved in *Sidebothom* was not the type that with any degree of certainty could be regarded as fatal. In addition *Sidebothom* presented distinct causation problems, the deceased having suffered injuries both within and without the ninety day period. The instant case suffers from neither of these infirmities. It was clear from the moment of the accident that the husband would die as a result thereof, the only question being one of time. Nor was there any causation problem, it being conceded by the defendant that the sole cause of death was the injuries suffered by the husband when struck by the car.

It is well settled that if a provision in an insurance policy cannot reasonably be applied to a certain factual situation it should be disregarded. This sound rule of law was succinctly articulated as early as *Grandin v. Rochester German Insurance Company*, 107 Pa. 26 (1884), where the Court refused to mechanically apply an insurance provision, saying: "It will thus be seen that where the reason of a condition does not apply this court has refused to apply it. Other instances of the same might be cited were it necessary. We are not to suppose that conditions involving forfeitures are introduced into policies by insurance companies, which are purely arbitrary and without reason, merely as a trap to the assured or as a means of escape for the company

in case of loss. When therefore a general condition has no application to a particular policy; where the reason which alone gives it force is out of the case, the condition itself drops out with it." Id. at 37. See also *Tennant v. Hartford Steam Boiler Inspection and Insurance Company*, 351 Pa. 102, 40 A. 2d 385 (1944) ; *Norlund v. Reliance Life Ins. Co.*, 282 Pa. 389, 128 Atl. 93 (1925). This case is clearly one where "the reason of a condition does not apply." The provision should not be applied to cases where, as this record establishes, no dispute exists as to the cause of death. Surely the ninety day provision was not meant to be "merely . . . a trap to the assured or as a means of escape for the company in case of loss."

Demonstrative of the principle that if a general condition has no relevance to a particular fact situation it is not applied are jurisdictions construing insurance policy provisions allowing awards for the loss of a limb, only if the loss occurs within sixty days of the accident. Claimants have successfully recovered when they produced medical testimony which established that it was obvious *before* the end of the sixty day period that the insured victim would need an amputation, but the actual amputation was delayed by doctors until *after* the sixty days period for reasons of health. *Westenhover v. Life & Casualty Insurance Co.*, 27 So. 2d 391 (La. App. 1946) ; *Interstate Life & Accident Co. v. Waters*, 213 Miss. 265, 56 So. 2d 493 (1952). Such rationale is directly applicable to the instant case. Here the appellant was prepared to prove through expert medical testimony that well within the ninety day period it was certain that the husband would die as a result of the injuries received; it was only due to extraordinary efforts on the part of attending physicians, implementing the most advanced medical techniques available, that the husband was kept scientifically alive.

Under the life insurance contract the specific hazard indemnified is premature death resulting from an accident. Recovery for that loss should not be forfeited by the arbitrary and unreasonable condition that payment will be made only if the accident victim dies within ninety days but not if he survives beyond that point. On this record it is obvious that to enforce the ninety day condition would serve only "as a trap to the assured or as a means of escape for the company in case of loss."

The waiver of premium exception in the accidental death supplement, previously noted, suffers from precisely the same public policy infirmities as does the ninety day limitation. Further, the waiver-of-premium exception, when read in conjunction with the entire waiver-of-premium supplement, creates an obvious ambiguity. Simply, the two provisions when read together yield the following interpretation: If the insured is totally and continuously incapacitated for a period of at least six months, the premiums due on the policy are waived by the company; however, if during the post-six month waiver-of-premium period the insured should die by accident, no double indemnity benefits will be paid. It is unclear whether the policy provisions preclude double indemnity recovery only in those cases where death is caused by a second accident which occurred after the six month period, or whether the policy bars double indemnity recovery in all cases where the insured dies by accidental means during a period when premiums are being waived.

As this Court has stated on innumerable occasions: ". . . [T]he contract of insurance is to be read, in the event of any ambiguity in its language, in the light most strongly supporting the insured." *Weissman v. Prashker*, 405 Pa. 226, 233, 175 A. 2d 63, 67 (1961). See, e.g., *Cadwallader v. New Amsterdam Casualty Co.*,

396 Pa. 582, 152 A. 2d 484 (1959); *Beley v. Mutual Life Ins. Co.*, 373 Pa. 231, 95 A. 2d 202 (1953); *MacDonald v. Metropolitan Life Ins. Co.*, 304 Pa. 213, 155 Atl. 491 (1931). Accordingly, on this record, the policy does not preclude double indemnity benefits.

The judgment is reversed and it is directed that summary judgment be entered for the plaintiff-appellant.

Mr. Justice MANDERINO joins in this opinion and also files a concurring opinion.

CONCURRING OPINION BY MR. JUSTICE MANDERINO:

I concur and join in the majority opinion. It is true that courts must not rewrite contracts between private parties. This presupposes, however, that all terms of the contract are legal. There has never been any question historically that a bargain will be considered illegal if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy. Restatement of Contracts §512 (1932). A bargain can be illegal because it violates statutory provisions or because it violates the law as developed by the courts for reasons of public policy. A list of all illegal bargains is impossible because the variety of public illegal bargains is almost infinite. Restatement of Contracts §512, Comments a and b (1932).

Historically and traditionally, bargains affecting domestic relationships have been closely scrutinized by the courts. Bargains providing financial inducements for a person to *voluntarily* accept restrictions on one's freedom concerning marriage, divorce, sexual relationships and other domestic relationships have frequently been stricken as opposed to public policy. Restatement of Contracts, Topic 10, §581 to §589 (1932). Likewise, financial inducements jeopardizing a person's life or health may constitute an illegal bargain opposed to public policy. Restatement of Contracts §591 (1932).

If the primary purpose of a complete bargain will not be defeated and the bargain can be enforced with the omission of the illegal condition, only the illegal condition is stricken and the other terms of the bargain remain binding and enforceable. Restatement of Contracts §603 (1932).

In this case the bargain was to pay a sum of money to the wife upon the death of her husband and to pay an additional sum upon the death of the husband by accidental means. Provisions referring to the *time of death* are conditions which do not defeat the primary purpose of the bargain which can be enforced even though the illegal portion is ignored as opposed to public policy.

As the majority opinion has pointed out, the advancement of the medical and pharmaceutical sciences in recent years subjects a person's *time of death* to control by the living. Financial inducements of any kind hovering over the family deathbed are as repugnant as other ancient illegal financial inducements affecting domestic relationships.

In matters involving the payment of life insurance, the law has on other occasions been sensitive to prohibiting financial inducements from *possibly* tempting one person to decide another person's time of death. Traditionally, we have required the beneficiary of life insurance proceeds to have an insurable interest. We have not wanted strangers to be unduly preoccupied with a person's time of death. Neither should we permit a member of the family—in this case a wife—to be so preoccupied.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

This case presents the question whether a contract of life insurance is to be interpreted and performed in accordance with the intent of the contracting parties as

expressed in terms which are neither unclear nor ambiguous, or whether it is to be rewritten by this Court through benefit of hindsight to afford a benefit where none was provided. Specifically, the question is whether a 90-day clause in a double indemnity provision means 90 days, or whether, in a "hard" case, it can be stretched beyond that period (in this case to some 1640 days), or ignored altogether as violative of public policy. It was the opinion of the lower court that the intent of the parties was as expressed in the policy and that no public policy restraints on the freedom of contract had been violated; the majority of this Court holds to the contrary. I believe the court below correct, and I accordingly dissent.

In 1949 a policy of insurance was issued by appellee insurance company on the life of Bartholomew E. Burne, then 22 years of age, in the face amount of $15,-000. Attached to and forming part of the policy was a supplemental agreement entered into on the date of issuance of the main policy, providing for an additional benefit, likewise in the amount of $15,000, in the event that death was accidental. This double indemnity provision read in part: "Such Accidental Death Benefit shall be due and payable *only* if the Company shall receive due proof ... (4) that such *death occurred* prior to the anniversary of said Policy on which the Insured's age nearest birthday was sixty years and *within ninety days from the date of the accident.*" (Emphasis supplied.)[1] Burne's death in October, 1963 is conceded to have resulted solely from the injuries he sustained by accident four and one-half years earlier in January, 1959. Today's decision allows the additional recovery

---

[1] The premium for the double indemnity feature was $31.05 per year. This was in addition to the annual premium of $476.55 for the basic $15,000 coverage.

for this accidental death (i.e., $15,000 in addition to the basic $15,000 face amount of the policy).

The majority, in reversing the summary judgment below in favor of the insurer, necessarily attempts to hurdle two obstacles: first, it seeks a rationale that will permit recovery under the above quoted accidental death benefit provision, notwithstanding the fact that the insured died well beyond the 90-day period; and secondly, it tries to avoid in some manner a provision in the accidental death benefit endorsement which would make double indemnity unavailable should death occur "while any premium is being waived under any disability benefit attached to . . . [the policy]," notwithstanding that premiums were being waived at the time of the insured's death. I am of the opinion that the majority has not successfully jumped either hurdle but instead has trampled on some fundamental principles of contract law in the attempt.[2]

I.  *The 90-Day Provision, The Intent of the Parties, and Public Policy*

a.  *Intent of the Parties*

In construing contracts arguably violative of public policy, we traditionally begin by determining the intent of the parties and only reach the question of public policy if then necessary.  *Block v. Mylish,* 351 Pa.

---

[2] Another issue, not reached by the Court, is whether the typographical format of the accidental death benefit provision, including particularly the 90-day clause, violated §617 of The Insurance Company Law of 1921, Act of May 17, 1921, P. L. 682, art. VI, as amended, 40 P.S. §752(A)(4). That section requires that "the style, arrangement and over-all appearance of the policy give no undue prominence to any portion of the text." The lower court found no such violation, and I agree completely. A close examination of page 8 of the policy, whereon appears the double-indemnity provision, fails to disclose anything even remotely misleading about either the placement or print employed in setting forth the 90-day provision.

611, 41 A. 2d 731 (1945); *Pocono Manor Association v. Allen,* 337 Pa. 442, 12 A. 2d 32 (1940); Restatement (Second) of Contracts §233, at 105 (Tent. Draft No. 5, March 31, 1970). The majority, however, first invalidates the 90-day provision of the accidental death benefit endorsement on public policy grounds, and only then advances a "well settled" principle of law that "if a provision in an insurance policy cannot reasonably be applied to a certain factual situation [,] it should be disregarded." In support of this principle, three of our past decisions are cited: *Grandin v. Rochester German Ins. Co.,* 107 Pa. 26 (1884); *Tennant v. Hartford Steam Boiler Inspection and Ins. Co.,* 351 Pa. 102, 40 A. 2d 385 (1944); *Norlund v. Reliance Life Ins. Co.,* 282 Pa. 389, 128 A. 93 (1925). An examination of these decisions reveals that in all of them the court sought to interpret the language of a contract to arrive at *the intention of the parties.* In *Grandin,* for example, the insured sought coverage of oil which was either stored in or passing through a pipeline system which he operated. The insurer issued a policy which was not adapted to that purpose, but rather contained a term which required the insured to be "the sole, absolute and unconditional owner." The court there was "driven to an examination of the character of the condition and the reason upon which it is founded, in order to ascertain whether it could have been *in the contemplation of the parties* when the contract of insurance was made." 107 Pa. at 35 (emphasis added). The court in *Grandin* concluded that it was *the intent* of the parties to write a contract of indemnity insurance whereby the insured would be recompensed for loss caused by destruction of oil in his pipelines, oil of which he was not the sole owner.[3] The term requiring that *Grandin* be

---

[3] The majority quotes and emphasizes the following sentence from *Grandin*: "We are not to suppose that conditions involving for-

the sole owner was not "within the contemplation of the parties", was not part of the contract.[4]  Both *Tennant,* supra, and *Norlund,* supra, are of similar import; both turn on the intention of the parties.[5]

---

feitures are introduced into policies by insurance companies, which are purely arbitrary and without reason, merely as a trap to the insured or as a means of escape for the company in case of loss." This passage is entirely apt when dealing with a clause which is obviously extraneous, out of place, and contrary to that which the insured requested.  It is inapposite when referring to a coverage specifically requested and paid for.

[4] Today the *Grandin* result would no doubt be reached under the Restatement (Second) of Contracts §237, at 131 (Tent. Draft No. 5, March 31, 1970), which provides:

"§237 Standardized Agreements.

"(1) Except as stated in Subsection (3), where a party to an agreement signs or otherwise manifests assent to a writing and has reason to know that like writings are regularly used to embody terms of agreements of the same type, he adopts the writing as an integrated agreement with respect to the the terms included in the writing.

. . . .

"(3) Where the other party has reason to know that the party manifesting such assent believes or assumes that the writing does not contain a particular term, the term is not part of the agreement."  In *Grandin* the insured specifically requested coverage of petroleum of which he was not the sole owner; he assumed that the contract he received did not require him to be sole owner.  The insurer, author of the contract, had reason to know that the "party manifesting assent" would assume that such a term was not in the policy.  Therefore, the term, although in fact included in the writing, is not a term of the contract because it was not so intended. See also U.C.C. §2-207(2)(b), 12A P.S. §2-207(2)(b).

[5] The majority cites two cases from states other than Pennsylvania in support of its proposition that courts have the power to read general conditions out of a contract if they have "no relevance to a particular fact situation": *Westenhover v. Life & Casualty Ins. Co.,* 27 So. 2d 391 (La. App. 1946); *Interstate Life & Accident Co. v. Waters,* 213 Miss. 265, 56 So. 2d 493 (1952).

Neither of those decisions, however, stands for the proposition for which the majority cites them.  Both hold that a clause in a disability policy which insures against "loss of limb" means "loss

I take no exception to the implicitly stated view of the majority that in interpreting contracts, courts should be careful not to defeat the intention of the parties by applying terms and conditions appearing in the writing to situations in which the parties could not have intended that they apply. Unlike the majority, however, I do not find that proposition of any help in this case. For I have no doubt—indeed, the parties do not argue otherwise—that not only the insurer but the insured *intended* that the additional recovery for an accidental death would be precluded if death in the normal acceptation of the term should occur more than 90 days after the date of the accident. Whatever else this appeal presents, therefore, it does not in my judgment present a problem in determining the intent—as of the time of contracting—of the parties.

of use of a limb" and does not mean "loss of limb by severance". Thus the fact that an amputation occurred after the 60-day period following the accident was irrelevant when loss of use of the limb had in fact occurred before the end of the 60-day period. In the policy at bar, the "loss" that is required prior to the end of the 90-day period is "loss of life"; that is to say, "death". Although it is possible to draft varying definitions of death, see Capron & Kass, *A Statutory Definition of the Standards for Determining Human Death: An Appraisal and a Proposal*, 121 U. Penn L. Rev. 87 (1972), a court should not undertake to attribute a meaning other than the normally accepted meaning to the term when it appears in a contract and there is no indication whatever that the parties meant anything other than the normal usage.

When an insurance company does define "loss" within a policy as meaning "loss by complete severance of a limb", only a complete severance within the policy time period will suffice. *Cornellier v. American Casualty Co.*, 389 F. 2d 641 (2d Cir. 1968); *Huffman v. Occidental Life Ins. Co.*, 264 N.C. 335, 141 S.E. 2d 496 (1965); *Shelton v. Equitable Life Assurance Society*, 28 Ill. App. 2d 461, 171 N.E. 2d 787 (1961). Cf. *Huff v. Vulcan Life & Accident Ins. Co.*, 281 Ala. 615, 206 So. 2d 861 (1968) (held: whether "loss by severance" includes severance at the wrist of all but a shard of skin is a jury question). See generally Anno., 39 A.L.R. 3d 1311.

b. *Public Policy*

The Court's public policy argument itself suffers from an ambiguity. Is the reader to understand (1) that *all* 90-day provisions in accidental death benefit endorsements are invalid as violative of public policy, or (2) only those found in policies owned by insureds who in fact die outside 90 days but without "some possible uncertainty" as to causation? There is ample support for either reading.

The opinion of the court observes that to enforce the 90-day limitation would permit "a gruesome paradox indeed—it would permit double indemnity recovery for the death of an accident victim who dies instantly or within 90 days of an accident, but would deny such recovery for the death of an accident victim who endures the agony of prolonged illness, suffers longer, and necessitates greater expense . . . ." This type of "gruesome paradox" in no way depends on a distinction between those after 90-day deaths that present "some possible uncertainty" as to causation and those that do not. Neither does the evocation of the specter of human greed shaping medical decisions depend upon whether or not the insured in fact died outside the 90-day period and without uncertainty as to causation.

On the other hand, the opinion of the court goes to some length to distinguish the case at bar from *Sidebothom v. Metropolitan Life Ins. Co.*, 339 Pa. 124, 14 A. 2d 131 (1940), where there was "inherent uncertainty" as to whether in fact death was caused by the accident. Were the first interpretation intended (all 90-day provisions void), then it would be idle to distinguish a case in which a 90-day provision appeared; the case would simply be overruled. It would appear to follow that not all such clauses are meant to be stricken, and that the validity of such a provision thus depends entirely upon whether the insured, like Bartholomew

Burne, died beyond the time limitation and without "some possible uncertainty" as to causation.

It is obvious that the Court is here determining the validity of a contract by means of hindsight. In so doing it fails to observe the fundamental principle that the judicial function in determining the validity of contractual terms must be limited to examination of circumstances known to the parties at the time of contracting. Thus the American Law Institute, in its section dealing with unconscionable contracts or terms, provides: "If a contract or term thereof is unconscionable *at the time the contract is made* a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may limit the application of any unconscionable term as to avoid any unconscionable result." Restatement (Second) of Contracts §234 (Tent. Draft No. 5, March 31, 1970) (emphasis added).[6] Contrary to what the Court apparently holds, it is my view that we must allow persons to make contracts which are reasonable in the light of circumstances known to them at the time of contracting. More we cannot ask; more we should not impose. Absent a violation of some external rule limiting freedom of contract, a court should not presume

---

[6] See also the prospective approach of the Restatement as to the enforceability of an agreement fixing damages (enforceable if the amount fixed is "a reasonable *forecast*" of just compensation). Restatement of Contracts §339 (1932).

In commenting on the enforceability of liquidated damage clauses in general, Professor Corbin has noted that the requirement is for a "reasonable pre-estimate", and that "[r]easonableness in retrospect is not always the same as reasonableness in prospect. Hindsight sometimes demonstrates the error in foresight. Here, too, it is often said that it is enough that it was a reasonable forecast and that *it is immaterial what the later event turned out to be*." A. Corbin, Corbin on Contracts §1059, at 346-347 (1964) (emphasis added).

to intervene and redraft contracts which were reasonable at the time they were entered into.

The majority finds, however, that such an external rule is here present and that it is violated: "To predicate liability under a life insurance policy upon death occurring only on or prior to a specific date, while denying policy recovery if death occurs after that fixed date, offends the basic concepts and fundamental objectives of life insurance . . . ." The "basic concept and fundamental objective" of life insurance, I should have supposed, was to provide a fund of money payable upon one's death to a designated beneficiary in accordance with terms and conditions and for the considerations mutually agreed upon between the insurer and the purchaser of the insurance (usually the insured). Here the basic policy was one for "ordinary life", and the proceeds of $15,000 were paid upon Burne's death to his widow, the appellant, as beneficiary. The present suit is to compel payment of the additional $15,000 under the accidental death benefit endorsement added to the policy for a small additional premium (less than 10% of the basic premium). This additional benefit was subject to two limitations as to time: (1) that death occur prior (in effect) to the insured's 60th birthday, and (2) that it occur "within 90 days from the date of the accident."

The court gratuitously attributes unworthy motives to spouses and relatives and suggests (with no support in the record) that medical decisions in hospitals might be influenced by the existence of the 90-day clause. Specifically, the majority argues that the decision whether or not to try to keep a patient alive might be dictated by the venal interest of the beneficiary in having death occur within 90 days of an accident. This rationale, however, would not be limited to the 90-day clause, but would apply as well to the 60-year-old

clause. Indeed, it would reach beyond the accidental death coverage to the basic policy, and, a fortiori, to term insurance. For example, the wife in a situation such as the one at bar might well decide to forego further treatment of a comatose and certainly dying husband rather than allow additional costly medical treatment to consume not only the patient's estate but also the wife's life insurance proceeds (assuming that they would be available, or that the wife would make them available, for medical expenses). Other situations can easily be imagined in which a family medical decision might be made, quite understandably, in the light of financial limitations. Certainly no court should attempt to pass judgment on these possibilities under the rubric of "public policy"; no more should we strike down the clause in issue because of unfounded and conjectural fear that the greed of a beneficiary will be allowed to deny proper medical treatment to the insured patient.

The court states, without benefit of legal or medical authority, that the *Sidebothom* holding, supra, like the 90-day clause itself, has been rendered obsolete by the advances in medical science in the last 30 years. I disagree. There is nothing in this record to suggest that Bartholomew Burne might not have lived four and one-half years after this accident had it occurred, say, in 1943 rather than in 1958. There is nothing to suggest that so few deaths now occur within 90 days of an accident as to make 90 days an unreasonable or unconscionable span by which to measure the attachment of coverage. A degree of arbitrariness may be involved in the stipulation of 90 days; that factor would be present in any time period, whether shorter or longer. The concededly valid purpose of the provision is to minimize uncertainty and dispute as to cause of a death allegedly

due to accidental means by preventing the accident from becoming too remote in time. While no controversy on that subject exists here, we should not overlook the fact that insurance companies have set their rates in reliance on the actuarial statistics and other data pertaining to deaths within 90 days. Whether or not the agreed-upon terms comport in every situation with the possibilities today offered by current medical practice, they were contracted for voluntarily in 1949, with the approval of the Pennsylvania Insurance Commissioner, and it cannot be said that they were then or are now either unfair or contrary to public policy.[7]

---

[7] Under The Insurance Company Law of 1921, Act of May 17, 1921, P. L. 682, art. III, §354, as amended, 40 P.S. §4776, a policy of life insurance such as that involved here must have been filed for "formal approval" with the Insurance Commissioner of the Commonwealth. If the Commissioner disapproves of policy language or terms, judicial review may be sought by the insurer.

It thus appears that the General Assembly has placed *primary* responsibility for determining which insurance policy provisions are in accord with public policy in the Commissioner of Insurance. A review of the regulations published by that official reveals that (1) insurance policies are given close examination, (2) many provisions and types of policies are proscribed altogether, and (3) the 90-day clause which the majority here strikes down has not been condemned by the Commissioner. We must assume that this particular contract was approved by the Commissioner. *Longenberger v. Prudential Ins. of America*, 121 Pa. Superior Ct. 225, 183 A. 422 (1936).

Although the appellee-insurer has not advanced the proposition, I venture to suggest that the doctrine of primary administrative jurisdiction might well apply here and require the plaintiff-appellant to obtain first the views of the Commissioner of Insurance through an administrative proceeding as to whether the 90-day limitation at issue here violates public policy. See *Weston v. Reading Company*, 445 Pa. 182, 282 A. 2d 714 (1971). Even were the Commissioner inclined to view this provision as violative of public policy, it is most unlikely that he would attempt to give his opinion retroactive effect, thus upsetting the statistical balance through which insurance rates have been established.

In my view the holding that the clause here in question is unenforceable as against public policy is not only without precedent in judicial decisions, but is also without justification in fact.[8]

## II. *The Waiver of Premium Provision*

The claim of the appellant should fail for yet another reason quite independent of what has been discussed before. Even assuming the invalidity of the 90-day provision, the beneficiary is, in my view, precluded from recovery by an exception in the accidental death endorsement referred to earlier, and quoted herewith: "EXCEPTIONS: This Accidental Death Benefit shall not be payable if the death of the Insured shall result . . . . (10) . . . while any premium is being waived under any disability benefit attached to or incorporated in said Policy . . . ."[9] The policy did have a disability benefit attached which provided that the company would—"waive the payment of each premium becoming due under said Policy after the commencement of such disability, provided however, that no premium shall be waived, the due date of which is more than six months prior to the date of receipt [by the Company] of written notice of claim hereunder . . . ."[10] "Disability" is defined in the endorsement as a condition which prevents the insured from "performing any work or trans-

[8] Anno., Validity and Construction of Provision in Accident Insurance Policy Limiting Coverage for Death or Loss of Member to Death or Loss Occurring within specified Period after Accident, 39 A.L.R. 3d 1311 (1971) (*all* cases therein cited); J. Appleman, Insurance Law §612, at 746 (1941 ed.).

[9] This provision was in consideration of an additional premium of $7.80 per year.

[10] Although the record does not reveal on what date the waiver of premium provision of Burne's policy was activated by notification of disability, it is clear that premiums have been waived under that clause prior to Burne's death 4½ years after the date of the accident.

acting any business for compensation or profit" and which "has already continued uninterruptedly for a period of at least six months".

Contrary to the majority, I am unable to read this waiver-of-premium benefit and the accidental death benefit as producing an ambiguity.[11] If, as I think clear, the insured's death prior to the expiration of a 90-day period following the date of accident was intended by the parties as a necessary condition to recovery under the accidental death benefit endorsement, then it is evident that the two provisions mesh well. Because the insured's disability following what the majority would refer to as the "first accident" must continue uninterruptedly for six months in order to activate the waiver-of-premium benefit, there can be no recovery under the accidental death benefit, if the "first accident" eventuates in the death of the insured since the death did not occur within the required 90-day period. As to the result when death is caused by accidental means while premiums are being waived due to a previous disability (what the majority calls the "second accident") the situation is equally clear: The insured's death because of the "second accident" will not entitle the beneficiary to double indemnity; indeed, this is the precise situation against which the insurer drafted this language.

Any uncertainty which the majority finds in the interrelationship of the two clauses (accidental death and waiver-of-premium) is due altogether to the majority's own and, as I believe, erroneous invalidation of the 90-

[11] The opinion of the court describes the ambiguity thus: "It is unclear whether the policy provisions preclude double indemnity recovery only in those cases where death is caused by a second accident which occurred after the six month period, or whether the policy bars double indemnity recovery in all cases where the insured dies by accidental means during a period when premiums are being waived".

day limitation. It is understandable that the policy language is not well adapted to the situation resulting from that invalidation. It is only because the majority allows double indemnity for a death resulting beyond the 90-day period that it finds it necessary also to circumvent, on the theory of ambiguity, the waiver of premiums clause. Nevertheless, as I have indicated, it seems to me that even with the 90-day clause ruled out, the deliberate invocation by the insured of the waiver-of-premiums provision operates as a bar to double recovery by the beneficiary appellant. "This Accidental Death Benefit shall not be payable if the death of the Insured shall result . . . while any premium is being waived. . .".

Being completely satisfied that the lower court was correct in disallowing the claim in this case, notwithstanding the obvious appeal to one's sympathies which it contains, I would affirm the judgment for appellee.

Mr. Chief Justice JONES joins in this dissenting opinion.