## Miller v. Nationwide Insurance Co.

*James B. Yelovich* and *Kimmel & Rascona,* for plaintiff.

*John J. Barbera,* of *Barbera & Barbera,* for defendant.

COFFROTH, *P. J.,* March 19, 1975—We must pass on defendant's motion for judgment on the pleadings which consist of an amended complaint, answer and new matter, and reply to new matter. The motion is in essence a demurrer to the record: Sprague v. Pumphrey, 29 Somerset 202 (1974); Runner v. Runner, 29 Somerset 193 (1974).

The action is in assumpsit by an insured against the insurer on a garage liability insurance policy. The issue is coverage, and centers upon interpretation of the insuring clause and a clause of exclusion in the policy.

Plaintiffs operate a vehicle service garage where they improperly serviced a customer's truck caus-

ing the oil in the engine to leak or be forced out when driven. As one of the plaintiffs was driving the truck to return it to the customer following servicing, the lack of oil caused damage to the vehicle.

Plaintiffs sued insurer for the amount of the damage under the terms of their garage liability policy, which grants the following coverage in Part Nine I:

"The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

Coverage G. bodily injury or

Coverage H. property damage

to which this insurance applies, caused by an occurrence and arising out of garage operations, including only the automobile hazard for which insurance is afforded in the declarations. . ."

In the definitions section of the policy (page 3) the following relevant terms are defined:

"'property damage' means injury to or destruction of tangible property;"

"'occurrence' means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured;"

In Part Nine VII of the policy entitled "Additional Definitions," the term "garage operations" is defined as

"the ownership, maintenance or use of the premises for the purposes of a garage and all operations necessary or incidental thereto;"

The "automobile hazard" mentioned in the insuring clause above quoted refers to coverages K-1

(fire and explosion), K-2 (theft), K-3 (riot etc.) and K-4 (collision or upset) under Part Nine III of the policy. "Automobile hazard" is defined in Part Nine VII, "Additional Definitions;" it applies only to the "ownership, maintenance and use" of an automobile for the purpose of or in connection with garage operations, and is not applicable in the instant case.

The pleadings support the conclusions that the property damage sued for was "caused by an occurrence and arising out of garage operations," and that plaintiffs by reason of negligence in servicing the car in their garage operation became legally obligated to pay the amount of the property damage. Accordingly, the loss falls within the language of the insuring clause of the garage liability section of the policy, and must be paid unless the risk is validly excluded elsewhere in the policy.

The insuring clause contains the phrase "to which this insurance applies," which refers to a long list of risks to which "This insurance does not apply. . ." under the heading "Exclusions," immediately following the insuring clause. The defense is focused upon exclusion (g)(2) which denies coverage for property damage to

"(2) property in the care, custody or control of or being transported by the insured or property as to which the insured is for any purpose exercising physical control; but part (2) of this exclusion does not apply to property damage arising out of the ownership, maintenance or use at the premises of any automobile servicing hoist, or to such insurance as is afforded for the use of elevators at the premises;"

The defense contention is that the damage to the vehicle in the instant case occurred while it was in

plaintiffs' care, custody and control and while plaintiffs were exercising physical control thereof, and is therefore excluded from coverage.

It seems obvious if exclusion (g)(2) means what it says and is to be given full effect, plaintiffs cannot recover. The language itself is not ambiguous, and leaves no room for application of the usual canons of construction. We find no Pennsylvania appellate case involving this precise question, but the deci- sion in Fitzgerald v. Rottner, 56 D. & C. 2d 750 (1972), citing and relying on cases from other states, resolves the issue in favor of defendant. In Fitzgerald, plaintiff's car was at defendant's gar- age for servicing, which was to include oil change; defendant removed the oil but neglected to replace it and while delivering the car from the garage to plaintiff without oil in the crankcase, the engine was seriously damaged, for which suit was brought. Defendant sought to join his insurer as an additional defendant alleging liability coverage under a garage liability policy. Joinder was disal- lowed on two grounds: (1) violation of the rules of civil procedure prohibiting joinder of an express insurer or indemnitor (see Wheeler v. Travelers, 29 Somerset 45, 60, fn. 8, (1974)), and (2) exclusion (g)(2) read precisely as in the instant case precludes recovery against the insurer. The insuring clause in Fitzgerald is not set forth in the opinion; how- ever, examination of the cases cited reveals coverage similar to that of the instant case.

But we are greatly troubled about the validity of Fitzgerald and the cases therein cited, at least as respects the instant situation, for two reasons:

(1) This garage liability insuring clause com- municates to any person of ordinary perspicacity that the policyholder has purchased coverage for

servicing work negligently done at his garage for his customers. But a precise application of exclusion (g)(2) eliminates all such coverage for any damage occurring while the car is in the garage or being delivered to the customer, and furnishes such coverage only if the injury happens to occur after the owner has taken control of his vehicle. Of necessity a vehicle in the garage of the insured for repairs is always in his "care, custody and control" and the insured of necessity is "exercising physical control" of it. Such a broad exclusion so narrows the insuring clause, and so deprives the policyholder of coverage of an important risk in his garage business for which he would normally expect coverage under the insuring clause as to materially eviscerate that clause. The exception carved out is a large part of the rule, in terms of the risk reasonably expected to be covered by the broad language of the insuring clause.[1]

(2) The insuring clause occupies less than ten short lines of the policy. It is followed by a plethora of exclusions—14 separate exclusionary clauses plus 16 separate sub-clauses of exclusion of which (g)(2) is one, occupying almost an entire policy page of fine print. Added to the usual difficulty of insurance policy language is the overwhelming effect of mass. As we remarked in our first opinion in this case, setting "the Court or opposing counsel loose in the jungle of (this) insurance policy . . . approaches cruel and unusual punishment."

These two combined factors show up this insurance policy as an example of draftsmanship quite

---

1. We again call upon the wisdom of Andy Brown of Amos & Andy for enlightenment. He said of his insurance policy, after it was explained to him that he would collect nothing: "It gives it to you at the top, and takes it away at the bottom."

acceptable in a day gone by but frowned on today, because, instead of performing its function of clear communication, the policy does its best to avoid clarity. There is nothing in the insuring clause or anywhere else affirmatively stating that coverage for negligent servicing is restricted to property damage occuring off-premises (except for hoist and elevator operation) and then only when the insured is no longer in control of the vehicle. That constriction results only indirectly from the operation of exclusion (g)(2), and is not readily perceptible to ordinary reading. The affirmative language of coverage is rendered practically useless by the exclusions; coverage is ascertainable only by the intellectually difficult task of subtracting all of the exclusions from the broad generality of the insuring clause in an effort to discover by the process of elimination what might remain.[2] We are in agreement with the court in Vaughan v. Home Indemnity, 86 Ga. App. 196, 71 S.E. 2d 111 (Ga. 1952), involving a garage liability policy with language similar to exclusion (g)(2) and cited in Fitzgerald, supra, saying:

"While it can be ascertained just what coverage the policy afforded the insured by a minute examination of the terms thereof (and such an examination is necessary to discover just what coverage the policy afforded), the insurer, in keeping with good practice, should more clearly define in the insuring clause of its policies what coverage the insured had under the contract." 71 S.E. 2d, at 112.

We think that the severe restriction of exclusion (g)(2), unless explained, is not fully realized by the

2. Counsel and the court have had previous difficulty in trying to understand this policy. This is our third opinion on the subject.

purchaser and that, if it were explained and realized, the market for the policy would likely shrink.

The judiciary today reacts negatively to such insurance policies. The insurer has an obligation to define its liability clearly. See Cooling v. U. S. Fidelity and Guaranty, 269 So. 2d 294 (La. 1972); Boswell v. Travelers, 38 N.J. Super. 599, 120 A. 2d 250 (1956). There is an obligation to address average intelligence: Cox v. Santoro, 94 N.J. Super. 319, 228 A. 2d 101 (1967). An insurance policy should not, either by design or inadvertent effect, function "merely as a trap to the assured or as a means of escape 'for the company in case of loss.": Burne v. Franklin Life Ins. Co., 451 Pa. 218, 224, 301 A. 2d 799 (1973). Typical of the judicial attitude today is the statement of the Supreme Court of New Jersey in Harr v. Allstate, 54 N.J. 287, 255 A. 2d 208, 217 (1969):

"It is clear that this court's approach to defenses to claims on insurance contracts has changed very substantially in recent years. Our expressions have come in a variety of issues and contexts, but all have indicated as their keystone the goal of greater protection to the ordinary policyholder untutored in the intricacies of insurance. We have realistically faced up to the fact that insurance policies are complex contracts of adhesion, prepared by the insurer, not subject to negotiation, in the case of the average person, as to terms and provisions and quite unintelligible to the insured even were he to attempt to read and understand their unfamiliar and technical language and awkward and unclear arrangement. . . We have stressed, among other things, the aim that average purchasers of insurance are entitled to the broad measure of protection

necessary to fulfill their reasonable expectations; that it is the insurer's burden to obtain, through its representatives, all information pertinent to the risk and the desired coverage before the contract is issued; and that it is likewise its obligation to make policy provisions, especially those relating to coverage, exclusions and vital conditions, plain, clear and prominent to the layman."

Exclusions are the primary problem. Although unambiguous upon minutely focused study (which should not be required), mass and obscurity in exclusions produce their own coverage ambiguity in the form of pitfalls for the unwary and inexpert public, requiring resolution of such ambiguity against the insurer, just as an ambiguity in language is so resolved.

Some courts have accomplished this by refusing enforcement of exclusions which unduly narrow the general coverage of the policy beyond the apparent intent of the parties. See Walter v. Dunlap, 368 F. 2d 118 (3d Cir. 1966); Shain v. Mutual Benefit, 232 Ia. 1143, 7 N.W. 2d 806 (1943); Frost v. Allstate, 70 Lack. Jur. 151 (1969); compare Keller v. Gold, 28 D. & C. 2d 275 (1962).

The newer and better approach is by use of the concept of the contract of "adhesion" referred to in Harr v. Allstate, supra. A contract of adhesion is one in which one dominant party specifies the terms and the other merely *adheres* to them because he lacks bargaining power to mold them to his wishes or needs. This is a familiar notion, in new terminology. Mr. Justice Cohen, in Galligan v. Arovitch, 421 Pa. 301, 219 A. 2d 463 (1966), speaking of the standard clause in form leases relieving the lessor of liabilities, appropriately said in dictum (304):

"The result is that the tenant has no bargaining power and must accept his landlord's terms. There is no meeting of the minds, and the agreement is in effect a mere contract of adhesion, whereby the tenant simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely. It is obvious that analysis of the form lease in terms of traditional contract principles will not suffice, for those rules were developed for negotiated transactions, which embody the intention of both parties."

As Justice Cohen indicates, in the final analysis the intention of the parties governs. This contract is not sufficient of itself to establish that with any sense of confidence, so far as the issue in this case is concerned.

Therefore, in actions where the dominant party demands compliance with a mere contract of adhesion, a compensating burden of proof is placed upon that party to show that there was in fact a meeting of the minds upon the contractual provision in question. This is now done in respect of warrants of attorney for the confession of judgment (cognovit) in adhesive transactions. See Yachere v. Yachere, 29 Somerset 159 (1973), and Somerset Gasoline Company v. Harrington, 29 Somerset 283 (1974).

These principles are also now extended in Pennsylvania to insurance policies. In the recent case of Hionis v. Northern Mutual Ins. Co., 230 Pa. Superior Ct. 511, 516-17, 327 A. 2d 363 (1974), the court said:

"Insurance contracts have been viewed under the law as contracts of 'adhesion', where the insurer prepares the policy for a purchaser having no

bargaining power. Where a dispute arises, such contracts are construed strictly against the insurer. . . . When a defense is based on an exception or exclusion in a policy, our Supreme Court has held that such a defense is an affirmative one, and the burden is upon the defendant to establish it. . . . Even where a policy is written in unambiguous terms, the burden of establishing the applicability of an exclusion or limitation involves proof that the insured was aware of the exclusion or limitation and that the effect thereof was explained to him." (Citations omitted.)

Accord, Purdy v. Commercial Union Ins. Co. of N.Y., 50 D. & C. 2d 230 (1970) (Silvestri, *J.*).

This rule, casting upon defendant insurer the burden of showing that plaintiffs were aware of the meaning of exclusion (g)(2), is especially appropriate in the instant case where, as already explained, the language of the policy makes it so difficult to ascertain the limits of coverage as to be deceptive. Similar considerations were present in Hionis, supra, the court saying (at p. 517):

"Furthermore, when the language is read in a vacuum it is couched in technical and unclear terms; and, when the disputed clause (E)(3) and its subsection are read along with the Co-Insurance Provisions in the subject policies, greater confusion as to coverage owing a claimant for total loss is apparent."

Since it is not clear from the pleadings that plaintiffs were aware of the import of exclusion (g)(2) when the contract was made, that question must be resolved at the trial consistent with this opinion, and judgment on the pleadings cannot be entered.

## ORDER

Now, March 19, 1975, the motion for judgment on the pleadings is denied. The case shall be scheduled for arbitration sec. reg.