Betty BEST, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, a corporation, the Fidelity and Casualty Company of New York, a corporation, and Mutual Benefit Health & Accident Association, an assessment association, Defendants.

No. 42625.

United States District Court
N. D. California, S. D.

May 3, 1966.

Carroll, Davis, Burdick & McDonough, San Francisco, Cal., J. D. Burdick, San Francisco, Cal., for defendants, Continental Casualty Co. and Fidelity and Casualty Co. of New York.

Harold C. Nachtrieb, San Francisco, Cal., Allan, Miller, Groezinger, Keesling & Martin, San Francisco, Ca., for defendant Mutual Benefit Health & Accident Ass'n.

## MEMORANDUM OPINION

WOLLENBERG, District Judge.

This is a diversity of citizenship case brought under Title 28 U.S.C. § 1332 wherein plaintiff beneficiary, a resident of California, is suing for recovery on three flight insurance policies purchased by plaintiff's decedent husband prior to a fatal airline crash in South America. The defendant insurance companies, citizens of Illinois, New York, and Nebraska have denied liability on multiple grounds.

On September 14, 1962, there was purchased on behalf of Paul A. Best by his employer, California Crude Oil (a subsidiary of Standard Oil), a round-trip ticket from Varig Airlines in San Francisco, California which set forth the following itinerary: San Francisco to Los Angeles, to Lima, to Buenos Aires, to Rio de Janeiro, to Buenos Aires, to Santiago, to Lima, to Miami, to New York, to Los Angeles, to San Francisco. The ticket stated that it was valid until October 29, 1962. (Def. Exhibit C).

Subsequent to the purchase of the airline tickets on September 14, 1962, Paul Best purchased the three flight insurance policies sued upon by his beneficiary from the insurance counter desk at the San Francisco airport. The flight policies issued by Continental Casualty Co., Fidelity and Casualty Co. of New York, and Mutual Benefit Association are practically identical in form and each one in general provides for $75,000 of benefits to the beneficiary in the event of the accidental death of the insured. All of the printed form insurance policies carried certain limitations including policy period and type of air coverage. (Plaintiff's Exhibits 6, 7 and 8).

On September 14, 1962, decedent Best, President of California Crude Oil, departed from San Francisco, California pursuant to the above-mentioned ticket. After arriving in South America and due to certain events which threatened Standard Oil's crude oil operations in Brazil and Peru, Mr. Best embarked on a series of side trips not contemplated in his original itinerary.[1] The tickets for the numerous side trips were purchased by Mr. Best from Varig Airlines *after* he arrived in South America.[2] No exchange for the original ticket was ever made as provided for in the policies.

On November 26, 1962, (almost a month after the original ticket purchased in San Francisco had expired) Paul Best purchased a round-trip airline ticket on Varig Airlines with his airline credit card in Rio de Janeiro, Brazil, covering

---

1. The actual itinerary of Paul Best included the following side trips, Sao Paulo-Rio (10–11–62), Rio-Brasilia (10–12–62), Rio-Lima (10–16–62), Lima-Buenos Aires-Rio (10–18–62), Rio-Lima (10–26–62), Lima-Rio (11–11–62), Rio-Buenos Aires-Lima (11–14–62), Lima-Rio (11–17—62), Rio-Lima (11–20–62), Lima-Rio (11–24–62), Rio-Lima (11–27–62) (Stipulated facts, Exhibit "A" No. 5).

2. At all times referred to herein and up to the present time, Varig maintained ticket offices at Rio de Janeiro, Lima and Buenos Aires where any of the Varig tickets referred to herein could have been exchanged for another Varig airline ticket (Stipulated facts, Exhibit "A", No. 6).

a trip from Rio to Lima, Peru and return to Rio. He departed for Lima, Peru in the early morning of November 27, 1962. At approximately 3:37 a. m. Paul Best died in the crash of the Varig airliner enroute from Rio to Lima. After making proof of loss and filing a notice of claim, Mrs. Best brought this suit as beneficiary of the three insurance policies.

The defendant insurance companies have raised three defenses in an attempt to defeat plaintiff's claim for recovery under the policies. The unresolved issues are as follows:

1. Had the insurance policies expired prior to the accidental death of plaintiff's decedent?

2. Was plaintiff's decedent covered on his flight from Rio to Lima since he failed to substitute his round-trip ticket issued on November 27, 1962 for the original ticket purchased at point of departure on September 14, 1962?

3. Should coverage be denied since plaintiff's decedent, at the time of his death, was on a trip not contemplated by the original ticket and itinerary according to which the insurance policies were purchased?

The court turns first of all to issue number three. Under the terms of the flight insurance policies which Mr. Best purchased for a total premium of $7.50, the companies extended $225,000 of coverage upon the life of an individual for a particular trip between designated geographical points, i. e., point of departure, destination and return. This limitation upon coverage was set forth in the flight insurance policies involved in this litigation as follows:

(a) Continental Casualty Company policy:

"PART L. AIR COVERAGE. 'Injury' wherever used herein means bodily injury caused by an accident resulting directly and independently of all other causes in loss covered by this policy and occurring during the first flight taken by the Insured from the Point of Departure to the Destina-

tion and the return flight from the Destination to the Point of Departure, on or after the Date of Policy Purchase; provided a ticket for each such flight has been obtained prior to the initial flight from the Point of Departure and further provided that such injury is sustained in consequence of riding as a passenger, and not as a pilot or crew member, on a scheduled airline flight."

(b) The Fidelity and Casualty of New York policy:

"2. INSURING CLAUSE: Ticket or Pass Requirement. The Company will pay the benefits below if during the term of this policy the Insured suffers loss resulting directly and independently of all other causes from accidental bodily injury (hereinafter referred to as 'such injury'), sustained under circumstances specified below during the first one-way or round trip flight taken by the Insured after the purchase of this policy on Aircraft Operated by a Scheduled Air Carrier as defined below from the Point of Departure to the Destination, both shown above, and return if round trip ticket is obtained before leaving said Point of Departure, provided that at the time that the Insured sustains such injury he is traveling on a ticket or pass covering the whole of said airline trip, issued to him for transportation on an Aircraft Operated by a Scheduled Air Carrier. A ticket issued to the Insured aboard such aircraft after leaving the Point of Departure but before reaching the first scheduled stop of such aircraft shall be deemed to have been issued before leaving the Point of Departure."

(c) Mutual Benefit Health & Accident Association policy:

"PART A. DEFINITION OF 'INJURIES.' The term 'injuries' wherever used in this policy means accidental bodily injuries received during the first one-way or round airline trip made by the insured

between the Point of Departure and the Destination (both designated in the Schedule) on or after the Date of Policy Purchase designated in the Schedule; provided, however, such injuries are received while this policy is in force and as specified in paragraphs (1), (2), (3) or (4) below and further provided that an airline ticket (a) is issued to the Insured prior to leaving the Point of Departure, (b) is, or would have been, issued to the Insured while he is in flight, but prior to the time that the aircraft in which he is riding makes its first scheduled stop after leaving the Point of Departure, or (c) is issued to the Insured in accordance with Part F, and such airline ticket includes transportation for that portion of the trip during which such injuries are received."

The above clauses are designed to assure that coverage will be extended to those flight arrangements which were contemplated and purchased by the insured prior to leaving the point of departure (subject to certain exchange provisions provided for in the policies whereby the original ticket is exchanged for a substituted flight).[3] The policies clearly do not extend coverage to side trips purchased away from the point of departure and outside the original itinerary.[4] It is therefore necessary for this court to determine whether Mr. Best was, at the time of the fatal accident, on an uninsured side trip from Rio de Janeiro to Lima as defendants maintain or on the first leg of his insured return trip to San Francisco as plaintiff contends. In determining this issue, the burden of proof is on the plaintiff to establish that he comes within the terms of the policies extending coverage only to tickets purchased at the point of departure.

At the time of his death, plaintiff's decedent was traveling on a round-trip ticket issued by Varig Airlines on November 26, 1962 which provided transportation from Rio to Lima and return to Lima. The fatal flight was the fifth round trip from Rio to Lima which plaintiff had embarked upon since his arrival in Rio de Janeiro on September 16, 1962, none of which flights were covered by the original itinerary or included in the ticket purchased at the point of departure. However, plaintiff attempts to distinguish the fatal trip from the preceding Rio to Lima excursions by the testimony and communications of Standard Oil executives to the effect that Mr. Best was indeed upon the first leg of a short-cut return flight to San Francisco at the time of his death.

Mr. Don Stevens, the home based executive of California Crude Oil most closely in touch with Mr. Best testified that Standard Oil Crude Oil contracts with Peru and Brazil were seriously jeopardized in November, 1962 by political crises in Peru. Mr. Best as president of California Crude Oil was the trouble shooter in charge of attempts to stabilize the joint ventures entered into with South American countries. It is undisputed that happenings during the two weeks preceding Mr. Best's death had raised

---

3. See Continental Casualty Company Policy (Part V); Fidelity and Casualty Company of New York Policy (Part 3); Mutual of Omaha Policy (Part F).

4. Defendants in their briefs set forth the policy reasons for such limitations. "By limiting coverage to those flights which are listed on the insured's ticket prior to departure, the companies are enabled to limit the number of trips to which coverage will be extended and furthermore are enabled to immediately know whether the flight was covered, thereby preventing costly investigations. The elimination of the necessity for costly investigation in every instance in which an insured is involved in a crash is one of the reasons why the companies are able to provide such high insurance coverage for such low premiums". It is undisputed that Mr. Best could have purchased a "term policy at the same desk for a higher premium which would have covered him for any number of scheduled flights while he was in South America. Instead, Mr. Best purchased a "trip" policy designed to cover only certain enumerated flights.

serious policy issues for Standard Oil and that there was some confusion over the course of events to follow. Mr. George L. Parkhurst, Vice President of Standard Oil of California and a superior of Mr. Best corroborated Mr. Stevens testimony that the Peruvian political crisis severely threatened Standard Oil's interests and that the Board of Directors was concerned and carefully watching the events of that period. Mr. Parkhurst went on to testify that on November 26, 1962, he desired to meet personally for a policy discussion with Mr. Best who knew most about the situation. Parkhurst said he had preferred to meet in San Francisco, but he had not precluded the possibility of going to Lima to meet Best if Best had good reasons not to leave the situation in South America.

On November 26, 1962, Parkhurst wired Best: "Much more information required before we can authorize filing of protest or conducting negotiations. Believe consultation imperative. This can best be accomplished San Francisco. Highly desirable both Lima Attorneys participate but if this not feasible consultation with you is essential first step to policy determination. If timing does not permit your immediate return to San Francisco I will proceed Lima Wednesday or Thursday * * *" (Plaintiff's Ex. No. 1).

Best answered the wire on November 26 to Parkhurst: " * * * Recommend meeting be held in Lima as our partner and many other key people are there who would not attend San Francisco meeting. If you concur, please advise date/time of meeting. Plan to proceed to Lima midnight tonight as planned to try to get everything pinned down as much as possible prior to S. F. or Lima meeting. I will prepare requested memo. In meantime my comments are as follows (all based on important development late

Friday afternoon)" (Plaintiff's Exhibit 2).

The thrust of Parkhurst's tesimony and the telegraphic communications offered in evidence is that no final decision had been made prior to the fatal flight from Rio to Lima as to whether Best would remain in Lima or continue on to San Francisco. Only Best himself knew the late "Friday developments" referred to in his cable, the disclosure of which to Parkhurst might have been determinative of the location of the policy meeting in Lima. There is evidence which indicates that Best expected that he had sufficient reasons to remain in Lima and to meet with Parkhurst there. Best bought a round trip ticket from Rio to Lima and a return to Rio. Best also had made a hotel reservation in Rio for December 1, 1962 (Stipulation of Facts No. 10). Additionally evidence was offered to show that when Best departed from Los Angeles enroute to South America, he was carrying two pieces of luggage which weighed a total of 30 kilos. While aboard the flight from Rio to Lima on November 27, 1962, Mr. Best carried with him only one piece of luggage weighing 20 kilos.

█ Taking all of this evidence and testimony into account, this Court can only conclude that the final decision whether Best would return to San Francisco or remain in Lima would have been made in Lima had Best arrived as scheduled. No firm decision had been made prior to the fatal flight. It would be mere speculation for this Court to conclude that plaintiff had established by a preponderance of evidence that Mr. Best was on the first leg of a return journey to San Francisco. Therefore, plaintiff beneficiary has failed to come within the terms of any of the three insurance policies sued upon and accordingly judgment is rendered for defendants.[5]

5. The court does not therefore find it necessary to discuss issues 1 and 2 set forth above or to reach the legal issues raised by issues 1 and 2 involving the California

Supreme Court case of Steven v. Fidelity & Casualty Co., 58 Cal.2d 862, 27 Cal. Rptr. 172, 377 P.2d 284 (1962).