**Kathleen E. DABURLOS**

**v.**

**COMMERCIAL INSURANCE COMPANY OF NEWARK, NEW JERSEY and the Fidelity and Casualty Company of New York, Appellants.**

**No. 74–2157.**

United States Court of Appeals, Third Circuit.

Argued April 7, 1975.

Decided June 24, 1975.

Edward R. Murphy, Francis E. Marshall, Marshall, Dennehey & Warner, Philadelphia, Pa., for appellants.

David F. Binder, Raynes, McCarty & Binder, Philadelphia, Pa., for appellee.

Before BIGGS, VAN DUSEN and ALDISERT, Circuit Judges.

OPINION OF THE COURT

BIGGS, Circuit Judge.

On May 16, 1968, Kenneth and Shirley Daburlos purchased round-trip tickets from Philadelphia to Los Angeles and back. They made these purchases in Reading, Pennsylvania.

Prior to their departure from the Philadelphia International Airport on May 19, 1968, the Daburloses also purchased four (4) airline trip insurance policies, each in the face amount of $75,000, from defendants'-appellants' insurance counter at that airport and designated plaintiff-appellee Kathleen E. Daburlos as beneficiary. The cost of these policies was $2.50 each. The Daburloses then departed from Philadelphia on United Air Lines (UAL) scheduled flight 83Y, with a scheduled return flight on May 22, 1968, on Trans World Air Lines (TWA) flight 38Y, departing from Los Angeles

at 9:05 A.M. At the Los Angeles International Airport, the Daburloses bought tickets for a helicopter flight on Los Angeles Airways, Inc. (LAA) to Anaheim to visit Disneyland. On the return flight by helicopter from Anaheim to the Los Angeles Airport the helicopter crashed and the Daburloses were killed at approximately 5:55 P.M. on May 22, 1968. It is obvious that the Daburloses had no intention of returning on the scheduled TWA flight 38Y on May 22, 1968.

UAL, TWA, and LAA were scheduled air carrier operators as required by decedents' policies. In fact, LAA was the only authorized air line operating between the Los Angeles Airport and Anaheim.

■ Kathleen Daburlos instituted this action in diversity after the insurance companies, defendants, refused to pay the sums allegedly due on the policies. The insurance companies contend that the decedents had been killed while on a side trip which was not covered by the policies since decedents had not exchanged tickets. In the district court both parties moved for summary judgment, alleging that the facts were not in dispute and that the sole issue was the legal one of whether decedents' side trip was covered under the policies. Judge Clifford Scott Green denied these motions on the ground that a crucial factual issue required further development. This issue was stated to be the practicability or possibility of the insureds' compliance with the exchange provision. See 367 F.Supp. 1017, 1021 (E.D.Pa.1973). Subsequently, the case was tried before Judge Green without a jury and he entered judgment in favor of the plaintiff against each of the defendants, Commercial Insurance Company of Newark, New Jersey, and Fidelity and Casualty Company of New York, in the sum of $150,-000. 381 F.Supp. 393 (E.D.Pa.1974). This appeal followed. It requires a general examination of the often-litigated issue of coverage under such policies and a specific determination of whether coverage should be afforded in this case. We affirm, though on somewhat different reasoning than that of the trial court.[1]

## I.

■ Initially, there can be no question that under the doctrine of conflict of laws, the Pennsylvania substantive law applies for the insurance policies in this case were issued and delivered in Pennsylvania.[2] Accordingly, we must decide this case in the way we believe the Pennsylvania Supreme Court would determine it. The parties concede this point, and the district court's opinion approaches the case from a Pennsylvania standpoint.

We quote from Judge Green's opinion in *Daburlos,* 381 F.Supp. at 395–396, as follows:

"All four insurance policies involved are identical. They contain, at the top, blocks for the identification of the insured and the beneficiary. In addition, there is one block space for point of departure and one block space for point of destination and one of two squares to be checked indicating a one way or a round-trip ticket. On each policy, Philadelphia was listed as the point of departure and Los Angeles as the point of destination and the trip designated as on a round-trip ticket. Immediately above these blocks appears the following: 'I hereby apply to Company named below for Scheduled Air Carrier (Airline) Trip Insurance to insure me on one airline trip between the Point of Departure and Destination shown below.'

1. We may affirm even though the basis of our decision is not identical to that of the district court. *Rhoads v. Ford Motor Co.,* 514 F.2d 931, 934 (3d Cir. 1975).

2. *Cf. Griffith v. United Airlines,* 416 Pa. 1, 203 A.2d 796 (1964). *See also Pittsburgh Bridge &*

*Iron Works v. Liberty Mutual Ins. Co.,* 444 F.2d 1286, 1288, n. 2 (3d Cir. 1971); *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1210–1211 (3rd Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

"The principal clauses of the policy, as relevant here are as follows:

" '2. INSURING CLAUSE: Ticket Or Pass Requirement. The *Company will pay* the *benefits* specified below *if during the term of this policy* the *Insured suffers loss* resulting directly and independently of all other causes from *accidental bodily injury* (hereinafter referred to as "such injury"), sustained *under circumstances specified* below *during the first one-way or round trip flight taken by the Insured after the purchase of this policy* on Aircraft Operated by a Scheduled Air Carrier as defined below *from the Point of Departure to the Destination, both shown above, and return if round trip ticket is obtained before leaving said Point of Departure, provided that at the time that the Insured sustains such injury he is traveling on a ticket or pass covering the whole of said airline trip,* issued to him for transportation on an Aircraft Operated by a Scheduled Air Carrier. A ticket issued to the Insured aboard such aircraft after leaving the Point of Departure but before reaching the first scheduled stop of such aircraft shall be deemed to have been issued before leaving the Point of Departure.

" '3. SUBSTITUTE TRIP COVERED IF TICKET EXCHANGED. *In case of a change in the itinerary of said first airline trip referred to in Section 2 above,* following issuance of this policy and after the Insured has left the Point of Departure on said trip, *the insurance afforded as set forth in Section 2 above shall no longer apply on the original itinerary but shall apply on the new itinerary in the same manner and to the same extent as it would have applied on the original itinerary, provided that (1) the transportation ticket or pass issued to the Insured for said first airline trip prior to his leaving the Point of Departure has been exchanged for another ticket or pass* issued for transportation on an Aircraft Operated by a Scheduled Air Carrier *on the substituted trip and (2) the Point of Departure is the same as that shown above and (3) at least one other stop on the new itinerary is a stop that was scheduled on the original itinerary for said first airline trip.*

" '4. DEFINITION AND DELIMITATION OF COVERAGE. This policy applies only to such injury sustained by the Insured during such first or substituted airline trip referred to in Sections 2 and 3 above. . . .'

"These three provisions are on the front of the policy. Superimposed over these clauses, primarily clause 3, appear the following words, which are printed in half-inch high letters, outlined in red ink:

" 'THIS IS A LIMITED POLICY READ IT CAREFULLY.'

"The other relevant provisions of the policy are printed on the back of the policy.

" '6. POLICY TERM. This *insurance shall commence* on the day and hour shown above and shall *terminate either* upon completion of the above described airline trip or upon expiration of, *or surrender for refund or credit of, the transportation ticket* hereinbefore referred to *but in no event shall this insurance extend beyond a period of twelve months.*

. . . . .

" 'POLICY PROVISIONS. Entire Contract; Changes: *This policy,* including the endorsements and the attached papers, if any, *constitutes the entire contract of insurance.* No change in this policy shall be valid until approved by an executive officer of the Company and unless such approval be endorsed hereon or attached hereto. No agent has authority to change this policy or waive any of its provisions.' (Emphasis added.)"

The parties agree that the sole issue is whether decedents' failure to exchange tickets requires denial of coverage pursuant to Clause 3 of the policy.

The judgment for the plaintiff beneficiary was based on alternative holdings. First, and primarily, Judge Green found that it was factually impossible for the insureds to exchange tickets for substitute flight coverage in the manner envisioned by Clause 3 of the policy.[3] In Judge Green's interpretation, subsection 2 of Clause 3 permitted extension of coverage to a substitute flight if, *after the insured left the point of departure,* the original tickets were exchanged for new tickets which showed the original point of departure.[4] As a factual corollary to this interpretation, the District Judge found that had the Daburloses attempted to exchange their tickets at the Los Angeles Airport for ones giving them passage to and from Anaheim, the new

tickets would have read Los Angeles to Anaheim/Disneyland, Anaheim/Disneyland to Los Angeles to Philadelphia. In other words, a three-part ticket would have been issued for each traveler which would *not* have shown Philadelphia as the starting point. In short, only the unused portions of the original tickets would be rewritten under air line practice. From this, Judge Green concluded that impossibility under subsection 2 of Clause 3 vitiated the need to comply with the exchange requirement of subsection 1 of that clause.

We agree with this interpretation of subsection 2 of Clause 3 of the policy. See note 4, *supra.* In addition, we believe that the finding of factual impossibility is not clearly erroneous under Rule 52(a), F.R.Civ.P., 28 U.S.C. On the contrary, it is supported by the overwhelming weight of the evidence.[5]

**3.** Plaintiff does not deny that an exchange of tickets in Los Angeles was possible. In several cases, it has been held that coverage would be extended, notwithstanding failure to exchange tickets, where (or if) physical exchange was proved impossible. *Fidelity & Casualty Co. v. Smith,* 189 F.2d 315 (10th Cir. 1951); *Rosen v. Fidelity & Casualty Co. of New York,* 162 F.Supp. 211 (E.D.Pa.1958). The issue, however, is whether the policy required something more than mere exchange.

**4.** The learned District Judge had this to say on the subject of interpreting subsection 2 of Clause 3, 381 F.Supp. at 398:

"As we said above, it is obvious that the new ticket or an exchange would have to list Philadelphia as the point of departure to comply with the literal terms of clause 3, i. e. the new ticket would list Philadelphia—Los Angeles—Anaheim/Disneyland—Los Angeles—Philadelphia. The defendants were apparently of the same view when they wrote their brief in support of their motion for summary judgment. In a reply brief on that motion they put forth a second untenable position which we discussed in our memorandum denying *summary judgment* and which defendants have now abandoned.

"At trial, defendants abandoned their previous interpretations of the critical section of the contract and set forth a third position. Defendants now contend that the requirement of subsection (2) refers, not to the ticketed itinerary, but rather to the itinerary in fact as it appears on the policy. In our decision on the motion for summary judgment,

in examining all the possibilities, we said that subsection (2) could not represent a reference to the itinerary in fact rather than a ticketing requirement because such an interpretation would render the clause mere surplusage. We are still of that view.

"An examination of the policy demonstrates that subsection (2) of clause 3 must be read as a ticketing requirement in order for it to make sense in the context of the policy."

**5.** Helen Walsh, a ticketing representative of UAL for 21 years, testified as an expert witness. She explained that the airlines did not list the original point of departure on new tickets acquired by exchange after the passenger had left the point of origination. Notes of Testimony (January 28, 1974), pp. 17–18. Contrary to defendants' contention, we believe the district court properly certified her as an expert witness. The pre-trial examination of John T. Kane, a former Vice-President of LAA, yielded similar testimony to the effect that the exchanged tickets would not be rewritten to indicate the original point of departure. Pre-trial examination of John T. Kane (March 24, 1973), pp. 22–23.

Arch L. Pearson, Secretary of the "defendant company" (*sic*) admitted that, if subsection 2 of Clause 3 referred to an itinerary in fact requirement, there would be no circumstances in which non-compliance with that requirement would be possible. Notes of Testimony (January 28, 1974), p. 63. It is to be noted that both companies are apparently

There is much less certainty whether, under Pennsylvania law, the impossibility of performance of one section of Clause 3 obviates the necessity to comply with Clause 3's other requirements.[6] Defendants contend that the requirements of Clause 3 are separate in nature. They conclude that the Restatement, Contracts (1932), § 463 mandates performance of other bargains even though one duty proves impossible.[7] From this, they reason that the airlines' failure to list the point of origination on exchanged tickets does not excuse the insureds' failure to exchange tickets for a side trip. The difficulty in the defendants' position is that the law of Pennsylvania, as we understand it, has not adopted the Restatement rule.

■ Rather, the rule in Pennsylvania is that acts of a third party (e. g., the airlines' refusal to provide new tickets noting the original point of departure) making performance impossible do not excuse failure to perform if such acts were foreseeable. *Moore v. Whitty,* 299 Pa. 58, 149 A. 93 (1930); *Stern Enterprises, Inc. v. Penn State Mutual Ins. Co.,* 223 Pa.Super. 410, 302 A.2d 511 (1973); *Luria Engineering Co. v. Aetna Casualty & Surety Co.,* 206 Pa.Super. 333, 213 A.2d 151 (1965). The rationale of this rule is that it is the contracting party's duty to provide for such foreseeable occurrences in the contract.

However, applying this rule to the case at bar in order to reach a result is not easy. In the first place, the insurance policies involved here are classic contracts of adhesion, purchased in standardized form from defendants' counter with no opportunity for bargaining between the parties. Second, it is highly unlikely that the average airline passenger, insured under such policy, understands the ticketing requirement of Clause 3, subsection 2. Consequently, it is beyond reasonable belief that an insured could foresee the airlines' failure to perform the precise ticketing requirement. Certainly, the defendants, whose business dealings necessitate knowledge of airline operations, were better positioned to foresee this impossibility.[8]

The district court was well aware of the paucity of Pennsylvania precedent on this particular question. 381 F.Supp. at 400. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) requires us to apply Pennsylvania law to this diversity action. However, we deem it best to base our decision on somewhat different lines of Pennsylvania jurisprudence than did the learned District Judge because we find the approaches we will pursue clearer and more settled.

Similar reasoning compels us to avoid the district court's alternative holding that, where at the time the policy was

---

owned by another company. The insurance seems to have been written, however, by Commercial Insurance Company of New Jersey, 10 Park Place, Newark, New Jersey. Mr. Pearson is probably the secretary of Commercial Insurance Company of New Jersey.

6. As noted, the issue here relates solely to the exchange of tickets requirement. Defendants concede that, pursuant to subsection 3 of Clause 3, decedents' new itinerary contained at least one stop from the old itinerary.

7. "§ 463. *Partial Impossibility.* Where impossibility of performing part of the performance promised by a party to a bargain is of such character that if it related to the entire performance it would prevent the imposition of a duty or would discharge a duty that had arisen, and the remainder of the performance is

not made materially more difficult or disadvantageous than it would have been if there had been no impossibility, the existence of duty is affected only as to that part; and if performance of the whole contract is possible with only an unsubstantial variation, the promisor is under a duty to render performance with that variation."

8. Foreseeability implies an understanding of contractual requirements and an ability to apply them to all factual contingencies which may arise. Defendants' numerous interpretations of a subsection which they drafted suggest a lack of understanding of its implications. We may expect even less, and without doubt can require no more, of the insureds.

issued, the insurance company "knows or has reason to know that one of the conditions is inconsistent with the facts, and the insured is guilty of no fraud, the company is estopped from setting up the breach of such condition" as a defense. 381 F.Supp. at 402, n. 4. Assuredly, this principle would prevent the defendants from denying coverage where the *exchanged tickets* did not list the original point of departure. As is the case with the impossibility issue, it is uncertain whether the Pennsylvania Supreme Court would apply the foreseeability rule to the whole of Clause 3 or would merely separate the requirements of that Clause and apply it only to subsection 2 of Clause 3. In view of our disposition, we need not reach any conclusion on either the impossibility or estoppel issues.[9]

## II.

As indicated previously, the parties have raised a number of issues, some of which lie in comparatively untilled fields of Pennsylvania law where we fear, and find it unnecessary, to tread. Instead, we prefer to pursue other plainer paths of Pennsylvania law. As did the court below, we also prefer to restrict our decision to the narrowest possible grounds. 381 F.Supp. 393 at 402, n. 5.

There are two precepts of Pennsylvania insurance law which require us to conclude that coverage must be extended to the insureds in this case. Each involves the application of fundamental principles of the law of Pennsylvania, a jurisdiction which treats the insured with great liberality.

■ First, the insurer in Pennsylvania must, when invoking an exclusionary provision to defend against coverage, bear the burden of proving that the exclusionary provision is applicable to that particular case. In *Weissman v. Prashker,* 405 Pa. 226, 233, 175 A.2d 63, 67 (1961), the Pennsylvania Supreme Court, speaking through Justice Musmanno, explained:

"It must be noted at once that in a situation of this character, the insurer undertakes the burden of proving that the accident, on which liability is predicated, comes within the exclusionary provisions. This is a burden the insurer cannot escape if it is to prevail in the defense based on exclusion. In *Armon v. Aetna Casualty and Surety Co.,* 369 Pa. 465, 87 A.2d 302, 304, we said: 'A defense based on an exception or exclusion in a policy is an affirmative one, and the burden is cast upon the defendant to establish it.'"

Recently, the Pennsylvania Superior Court had occasion to comment on this burden of proof in *Hionis v. Northern Mutual Ins. Co.,* 230 Pa.Super. 511, 516–517, 327 A.2d 363, 365 (1974). Judge Hoffman, writing for the Court, stated:

---

**9.** We note that Judge Green refrained from making any decision as to the "alleged purpose of the exchange provision". 381 F.Supp. at 397. Plaintiff maintained that Clause 3 had no rational or valid purpose since there is no additional risk created by the exchange of tickets. The additional risk, she contended, is created by the substitute flight on which coverage is permitted and not by the ticket exchange.

The defendants assert that the exchange of tickets decreases investigatory costs pertaining to determination of coverage. The argument is made that the exchange is necessary so that the insurance carrier may ascertain the loss if an accident occurs and may ascertain the circumstances more quickly. They refer us to two courts which, they contend, have accepted this assertion. *First National Bank of Chicago v. Fidelity & Casualty Co. of New York,* 428 F.2d 499 at 502 (7th Cir. 1970); *Best v. Conti-*

nental Casualty Co., 272 F.Supp. 252 at 255, n. 4 (N.D.Cal.1966).

If it were demonstrated that Clause 3 has no valid purpose, it would be unenforceable because it would then constitute merely a trap for the unwary assured. *Grandin v. Rochester German Ins. Co.,* 107 Pa. 26, 37 (1884), cited with approval in *Burne v. Franklin Life Ins. Co.,* 451 Pa. 218, 224–225, 301 A.2d 799, 802–803 (1973). Likewise, if the impossibility of performance of subsection 2 of Clause 3 emasculated any valid purpose, the clause would be unenforceable. Under *Grandin, supra,* we may not assume the invalidity of purpose of such conditions. Nor need we decide whether the evidence so demonstrated since we premise our decision upon other requirements of Pennsylvania law.

"When a defense is based on an exception or exclusion in a policy, our Supreme Court has held that such a defense is an affirmative one, and the burden is upon the defendant to establish it. *Weissman v. Prashker*, 405 Pa. 226, 233, 175 A.2d 63 (1961). *Even where a policy is written in unambiguous terms, the burden of establishing the applicability of an exclusion or limitation involves proof that the insured was aware of the exclusion or limitation and that the effect thereof was explained to him.* See e. g., *Frisch v. State Farm Fire and Casualty Co.*, 218 Pa.Super. 211, 275 A.2d 849 (1971); *Purdy v. Commercial Union Insurance Co. of New York*, 50 Pa.D. & C.2d 230, 235 (1970)." (Emphasis added).

█ Thus, even if we assume Clause 3 was clear and unambiguous in the context of the policy, the defendants had the burden of establishing that the Daburloses were aware of the exclusion presented by that clause and that its effect was explained to them. The defendants did not meet this burden of proof.

█ There was no evidence as to the scope and nature of the functions of defendants' employees at the insurance counter in the Philadelphia Airport. There was no evidence that these employees or agents were retained for the purpose of explaining the differences among the defendants' various policies and the exclusionary terms of individual policies. Nor was there evidence that they did so in this case.[10] It is well known, and the district court so found in its opinion at 367 F.Supp. at 1018, that it is customary for the applicants for insurance immediately to mail the policy to the beneficiary in an envelope supplied by the insurer. There would seem to be little time for examination of the policy by the insured. Prolonged examination of the policy fails to disclose clearly its terms, and there is no doubt in our minds that its terms are uncertain and obscure. In conjunction with this, it deserves reemphasis that superimposed on Clause 3 and making it difficult, though not impossible, to read was a large-scripted red legend proclaiming, "This is a limited policy read it carefully." In sum, the evidence (or lack of it) depicts an operation whereby the insureds purchased several policies from the insurers without benefit of any explanation of what they had purchased. Awaiting the arrival of the flight, they completed the application and mailed the policies to their designated beneficiary. Not only are the requirements of the policies difficult to ascertain but also the insured is given no sample policies for further and more extended consideration. In these circumstances, the defendants clearly failed to meet their burden of proving under Pennsylvania law that the insureds were aware of the pertinent exclusionary provision.[11] Indeed, the record does not even support the conclusion that insureds are given a reasonable opportunity to comprehend the terms of the policy.

By itself, this failure of proof is sufficient to allow coverage in the instant case. There is, however, a second basic concept of Pennsylvania insurance law upon which recovery may be premised. This concerns the interpretation and resolution of ambiguous contractual provisions.

---

10. The parties' Stipulation of Facts showed that defendants' licensed resident agent countersigned the policies at the Philadelphia International Airport. As noted, there was no evidence that his functions were more than perfunctory.

11. The record suggests that the district court did not limit or hinder defendants' opportunity to present such evidence. In fact, the record contains a letter from defendants' counsel to Judge Green, dated February 1, 1974, in which the defense waived its right to present additional evidence. It states in part:

"Please be advised that, upon further consideration of our reservation to present additional evidence on behalf of defendants in the above captioned matter, defendants elect not to exercise such reserved right, and, therefore, rest their case."

The rule in Pennsylvania with respect to contracts is that where a portion of a contract is obscure or ambiguous, the court may receive extrinsic evidence with respect to the circumstances and language surrounding that particular clause. *Celley v. Mutual Benefit Health & Accident Association,* 229 Pa.Super. 475, 481–483, 324 A.2d 430, 434–435 (1974). See generally, 8 P.L.E. "Contracts", §§ 144, 161. However, if the contract is an insurance contract, the ambiguity must be resolved against the insurer. There is no need in an insurance case to take that extrinsic evidence. This policy was enunciated in *Hionis v. Northern Mutual Insurance Co.,* 230 Pa. Super. 511, 516–517, 327 A.2d 363, 365 (1974) in which the Superior Court stated:

> "Insurance contracts have been viewed under the law as contracts of 'adhesion', where the insurer prepares the policy for a purchaser having no bargaining power. Where a dispute arises, such contracts are construed strictly against the insurer. *East Coast Equipment Co. v. Maryland Casualty Co.,* 38 D. & C.2d 499, 207 Pa.Super. 383, 218 A.2d 91 (1966). In *East Coast,* we affirmed the decision of a court en banc on the basis of the lower court opinion which provided in part: 'The policy behind this rule [construction against the insurer] is sound; the insurer wrote the policy and the individual purchaser is concerned primarily with monetary benefits. Concern with definitional clauses and exclusions is minimal; therefore, if they do become material, they should be strictly construed against the insurer.' 38 D. & C.2d at 511, 218 A.2d at 98."

An extended discussion of this principle with appropriate citations is contained at 18 P.L.E. "Insurance", § 94.

It will be immediately noted that the provisions of Clause 3, read in conjunction with those of Clause 6, pertaining to cancellation of insurance when tickets are surrendered for refund or credit, create an ambiguity which to us seems irreconcilable. Clause 6 fixes the term of the policy and provides, as indicated, that it *ends upon the completion of the described airline trip or upon expiration of or surrender for refund or credit of the ticket.* Clause 3 extends coverage to a side trip if, among other things, the old tickets are exchanged for new ones.[12] After reading and considering Clause 6, a reasonable person might conclude that when he exchanges his ticket to include a side trip, the airline accepts the old ticket, gives him two sets of new tickets (one identical to the old), and then credits the old against the new, charging in essence only for the side trip. He might justifiably believe that, in surrendering the old ticket for the new ones while receiving credit for a portion of the exchange, he has terminated coverage under Clause 6. This is particularly so because neither Clause 3 nor Clause 6 contains language explicitly distinguishing its circumstances and import from that of the other.

Additional force is cumulated upon this ambiguity where, as here, the insured has decided not to fly on the originally scheduled return flight. Hence, if—after deciding not to return to Philadelphia from Los Angeles on TWA flight 38Y on May 22, 1968 at 9:05 A.M.—Kenneth and Shirley Daburlos had exchanged tickets, they would not merely have given the old tickets for two sets of new ones identical to the old ones except for the side trip. Instead, the old tickets would have been exchanged for ones which included both an entirely new scheduled flight for the Los Angeles to Philadelphia portion of the trip and the side trip. In doing so, the Daburloses would have surrendered the old tickets, upon which they received credit, and received two entirely different sets of tickets.

---

**12.** During the testimony of Arch Pearson (*see* note 5, *supra* ), the Court asked Mr. Pearson: "What the Insured buys, at the time of buying the insurance, is the right to make substituted trips?". Mr. Pearson responded: "That's true." Notes of Testimony (January 28, 1974), p. 59.

Excerpts from the testimony of Ms. Helen Walsh serve to illuminate this problem:

"Q. (By plaintiff's counsel) Miss Walsh, on cross-examination by [defendants' counsel], I think you agreed with [defendants' counsel] that an exchange of tickets is not synonymous with the surrender of tickets; is that correct?

"A. That's correct.

"Q. Does an exchange of tickets, such as the exchange that we are talking about with respect to Mr. and Mrs. Daburlos, does that include, as part of the exchange, a surrender of the original round-trip tickets?

"A. Yes, it does.

. . . . .

"Q. (By defendants' counsel) I just have a couple of questions, Miss Walsh. On this matter of surrender—surrender in the context that you asked is another way of saying that they were turned in, their original tickets, in exchange for new tickets which would cost them some additional money; isn't that true?

"A. It could cost them some additional money.

"Q. If they were going on an extended trip, they would not surrender the tickets in the sense that they are giving it to you and getting money back for that ticket?

"A. That's correct.

"THE COURT: I am getting a little confused. Let me see if I can get it straight.

"When one exchanges a ticket, he comes to you with a ticket; does he, in fact, give up that ticket and you in some way get that ticket?

"THE WITNESS: He gives me the ticket, and he gets—

"THE COURT: That very same ticket that he gave you, does he get that ticket back?

"THE WITNESS: No.

"THE COURT: He gets something back in exchange?

"THE WITNESS: Yes, he does.

"THE COURT: Is that another ticket?

"THE WITNESS: Yes.

"THE COURT: When he comes to you to surrender that ticket, he gives you that ticket; is that right?

"THE WITNESS: Yes.

"THE COURT: He does not get that ticket back; is that correct?

"THE WITNESS: Yes.

"THE COURT: He gets something else back, and that is money or some form of payment; is that right?

"THE WITNESS: Yes.

"THE COURT: Now, the common element in that is that whether he surrenders it or exchanges it, he gives you a ticket which he does not get back?

"THE WITNESS: That's correct.

"THE COURT: The distinguishing element is that, in an exchange you give him back another ticket, and in a surrender, you give him back money; is that it?

"THE WITNESS: Yes.

"THE COURT: All right; thank you.

"REDIRECT EXAMINATION

"By [plaintiff's counsel]:

"Q. Miss Walsh, [defendants' counsel] said that when the original part of the ticket—of the round-trip ticket is surrendered as part of an exchange, I think you said you don't get money back. But do you get credit for the price that you paid for the ticket-exchange?

"A. For an exchange, you will get credit on your new ticket.

"Q. Instead of getting money back, you get credit on your new ticket?

"A. Right." Notes of Testimony (January 28, 1974), pp. 39–42.

Defendants urge that the "exchange" requirement of Clause 3 and the "surrender" provision of Clause 6 are clearly distinguishable. They cite us to Miss Walsh's testimony as evidence of that

fact. The above-quoted testimony, however, only serves to convince us that what may be clear to an airline ticketing agent is confusing and ambiguous to the ordinary insured. Nor are we persuaded that the alleged basis for this distinction controls our determination of this issue. Defendants contend that the following portion of Miss Walsh's testimony disposes of the ambiguity question:

"Q. (By defendants' counsel) [(E)xchange and surrender] are two totally different things?

"A. Yes.

"Q. The book that defines that, the IATA [International Air Transportation Association] manual, makes a clear distinction between a surrender and an exchange?

"A. Yes." Notes of Testimony (January 28, 1974), p. 26.

The insurance policies contain no reference to the IATA manual, no definitions of these terms, and no indication that they are being used in a technical sense. We cannot see how under these circumstances, knowledge could possibly be imputed to the insureds that these words (*viz.,* "exchange" and "surrender") were utilized in a manner other than that conveyed by their respective plain and ordinary meanings.

 The rule in Philadelphia dictates that, if the words of an insurance policy are clear and unambiguous, they are to be given their plain and ordinary meanings. *Pennsylvania Manufacturers' Association Ins. Co. v. Aetna Casualty &*

*Surety Ins. Co.,* 426 Pa. 453, 233 A.2d 548 (1967). See generally, 18 P.L.E. "Insurance", § 93. Individually, the exchange requirement of subsection 1 of Clause 3 and the surrender provision of Clause 6 are uncomplicated and comprehensible. Taken and read in conjunction while according the words their popular usage, they create an ambiguity which might cause an insured—unaware of the technical meanings of the terms—to refrain from exchanging tickets (while being given appropriate credit toward a side trip) for fear of losing his coverage under Clause 6. As we have noted, this ambiguity must under Pennsylvania law be construed against the insurer and in favor of coverage. *Burne v. Franklin Life Ins. Co.,* 451 Pa. 218, 226–227, 301 A.2d 799, 803 (1973);[13] *Hionis v. Northern Mutual Ins. Co.,* 230 Pa.Super. 511, 516–517, 327 A.2d 363, 365 (1974) (quoted, *supra*).

Pennsylvania law mandates that coverage must be extended in the case at bar not only because defendants failed to meet their burden of proof as to decedents' awareness of the exclusion but also because of the ambiguity arising from Clauses 3 and 6.

### III.

Though unessential to our disposition of this case, it is appropriate to examine briefly other air trip insurance cases in order to place the instant case in its proper perspective.

In *Lachs v. Fidelity & Casualty Co. of New York,* 306 N.Y. 357, 118 N.E.2d 555,

---

**13.** The liberality of the Pennsylvania Supreme Court toward insureds is well illustrated by the decision in Burne. In this case, despite the express provision of a policy that a claim must be made within ninety days, a claim was not made until four and one-half years later, the insured being kept alive by medical aid in a vegetative state. A judgment in favor of double indemnity was granted. Justice Roberts stated:

"It is well settled that if a provision in an insurance policy cannot reasonably be applied to a certain factual situation it should be disregarded. . . . This case is clearly one where 'the reason of a condition does not apply.' The provision should not be ap-

plied to cases where, as this record establishes, no dispute exists as to the cause of death. Surely the ninety day provision was not meant to be 'merely . . . a trap to the assured or as a means of escape for the company in case of loss.' "
451 Pa. 218, 224–225, 301 A.2d 799, 802–803 (1973).

Although the specific holding in Burne does not apply to the instant case, it amply demonstrates the inclination of the Pennsylvania Supreme Court in insurance cases and its reluctance to implement conditions precedent, which bar recovery, where those conditions are unrelated to risk.

rehearing denied 306 N.Y. 941, 120 N.E.2d 216 (1954), the decedent had purchased airline trip insurance and then, contrary to the policy's coverage, boarded a nonscheduled airline flight. The trial court denied defendant insurance company's motion for summary judgment. The Court of Appeals of New York affirmed the denial. After detailing the circumstances surrounding the purchase, the Court provided the following insightful statements:

> "No doubt it is advisable, if not indeed necessary, as a matter of business competition to sell insurance policies from automatic vending machines. It may save money to have a number of machines instead of a salesman. It may be wise because people hurrying to planes will not wait in a line to buy insurance. However, there must be a meeting of minds achieved between the applicant and the company through an application and signs and lettering, for while the applicant has a mind the machine has none and cannot answer questions. If the defendant had paid for a living salesman, the decedent would not have purchased the insurance if it did not cover her trip or she might have purchased it and changed her plane. So there must be additional care taken."

118 N.E.2d at 559.

A rather similar situation was presented in *Steven v. Fidelity & Casualty Co. of New York,* 58 Cal.2d 862, 27 Cal.Rptr. 172, 377 P.2d 284 (1962). The opinion in this case opens with the following statement made by Justice Tobriner:

> "We point out here why we have concluded that the provisions of an airplane trip insurance policy on the life of the beneficiary's husband did not plainly or clearly provide for noncoverage, and why, in the absence of such provision, in this unusual case, the insurer is liable. Accordingly, we do not believe that the judgment for

the insurer, rendered after trial without a jury, should stand."

27 Cal.Rptr. at 174, 377 P.2d at 286.

In this case the Supreme Court of California held for naught an express provision that the policy did not cover ordinary travel on other than scheduled air carriers where the plaintiff's decedent was killed on a substituted chartered flight. Three Justices dissented, including Chief Justice Traynor. The Court shifted the burden of proof to the effect that if an airline insurance policy of the sort *sub judice* has once been issued, the burden is on the insurer to demonstrate that the insured was apprised of the asserted non-coverage. 27 Cal.Rptr. 172, 377 P.2d at 290.[14] In so doing, it emphasized the singular nature of the transaction:

> "If the classic rules of interpretation lead to the conclusion that the policy afforded coverage here, we must point out additionally that they apply with special force in the circumstances of this case. We do not deal here with the orthodox insurance policy sold in the protective aura of the insurer's explanation and discussion of its terms. The vending machine emitted a complex stereotyped document, which, because of the short time elapsing before the start of Mr. Steven's flight, hardly afforded him an opportunity even to read the policy. The mass-made contract, sold by the machine under such conditions, symbolizes the kind of transaction that lends to the accepted rules a special gloss of interpretation. As we shall explain in more detail, the cases have held that in such contracts the expected coverage of the policy can only be defeated by a provision for limitation which has been plainly brought to the attention of the insured."

27 Cal.Rptr. at 181, 377 P.2d at 293.

It will be noted that, although the factual circumstances are somewhat differ-

---

**14.** The decision in Steven also dealt with an exchange of tickets provision. The Court noted that this requirement could not be applied to "substitute transportation taken because of the cancellation of a scheduled flight". 27 Cal. Rptr. at 180, 181, 377 P.2d at 292, 293.

ent than those of the instant case, the approaches of · these two distinguished state tribunals are identical to that employed here—*viz.,* the lack of notice to the insured of non-coverage. We emphasize that the record in the instant case does not support the conclusion that defendants' substitution of an insurance counter, manned by agents, in place of policy-dispensing machines provides insureds with greater notice or deeper understanding of what they have purchased.

Various courts have reached the logical conclusion that coverage will not be defeated, despite a failure to exchange tickets for a side trip, if an exchange of tickets was not possible. *Fidelity & Casualty Co. v. Smith,* 189 F.2d 315 (10th Cir. 1951); *Rosen v. Fidelity & Casualty Co. of New York,* 162 F.Supp. 211 (E.D. Pa. 1958). Though such an exchange was not impossible in the case *sub judice,* we believe it noteworthy that in each of the cited cases the Court emphasized that, since the policy permitted extension of coverage to side trips, the failure to exchange tickets could not affect the risk assumed by the insurer. *Smith,* 189 F.2d at 318;[15] *Rosen,* 162 F.Supp. at 214. See note 9, *supra.*

We are cognizant that several courts, posed with the identical issue presented here, have reached a contrary conclusion and held that the insurer incurs no liability where the insured fails to exchange tickets for a side trip. *Roberts v. Fidelity & Casualty Co. of New York,* 452 F.2d 981 (9th Cir. 1971) (apparently applying, though there is no discussion of, Oregon law); *First National Bank of Chicago v. Fidelity & Casualty Co. of New York,* 428 F.2d 499, 501 (7th Cir. 1970), cert. denied, 401 U.S. 912, 91 S.Ct. 878, 27 L.Ed.2d 811 (1971) (applying Illinois law to the effect that a written contract determines the parties' rights and that the insurer has a right to limit coverage[16]);

*Best v. Continental Casualty Co.,* 272 F.Supp. 252, 256 n. 5 (N.D.Cal.1966) (applying California law without discussion of the *Steven* case, *supra* ); *Mack v. Commercial Ins. Co. of Newark, New Jersey* (unreported), Case No. 3834, decided May 1, 1973 (per curiam), Court of Appeals, 5th District, Stark County, Ohio, cert. denied, No. 73–541 (Ohio Supreme Court September 14, 1973).[17] It deserves mention that the *Roberts* and *Mack* cases involved helicopter crashes on LAA and that the *Mack* case was part of the litigation arising from the same crash which took the lives of the Daburloses.

Naturally, these cases do not control the result in the instant case. We are bound instead by Philadelphia precedent. Nor are we persuaded by the reasoning of these opinions. An examination of the *First National Bank* and *Mack* cases reveals that Illinois and Ohio law are simply more reliant on contractual language than Pennsylvania law which requires scrutiny of the circumstances surrounding execution of the policy. The *Best* case, as noted, interprets California law without any treatment of the earlier *Steven* opinion. Finally, *Roberts* applies Oregon law but with little enlightenment as to Oregon rules of construction of insurance policies. Our research indicates that, under Oregon law, coverage is determined by ascertaining the intent of the parties as evidenced by the agreement (i. e., the four corners of the document). Although Oregon requires that reasonable doubts be resolved in favor of the insured, it does not provide—as Pennsylvania does—that the insured's burden of proof includes demonstrating that an exclusionary clause is applicable to the circumstances of the case *and* that the insured was aware of the provision relating to non-coverage. *Denton v. International Health & Life Ins. Co.,* Or., 528 P.2d 546 (1974); *Farmers Mutual*

---

**15.** In Smith, the Court explicitly refrained from deciding whether coverage would be extended had exchange of tickets been possible. 189 F.2d at 318–319.

**16.** The Court in First National Bank expressly rejected the Steven holding, *supra,* "in so far

as it deems the reasonable expectations of the insured as controlling the policy's express terms". 428 F.2d at 501.

**17.** A copy of this opinion is contained in Appellants' Appendix, pp. 219a–227a. A copy of the certiorari denial appears at p. 228a.

*Ins. Co. v. United Pacific Ins. Co.,* 206 Or. 298, 292 P.2d 492 (1956).

Our decision is similar to that reached in a recent case in the New York County Supreme Court. *Kronfeld v. Fidelity & Casualty Co. of New York,* 365 N.Y.S.2d 416 (1975) (Trial Term, Part 61), decided March 6, 1975. In that case, Morris Kronfeld had purchased airline trip insurance identical to the Daburloses' prior to flying from New York to Los Angeles. As in the instant case, the policies were purchased from a flight insurance counter. Upon reaching Los Angeles, he purchased helicopter tickets from LAA for Anaheim/Disneyland. He did so without exchanging tickets. Subsequently, he died on the same helicopter mishap as the Daburloses. Following trial before a jury, the trial court granted the beneficiary's motion for judgment on the grounds, *inter alia,* that New York law requires the insurer to provide clear notice of non-coverage to the insured. Reliance was placed upon the *Lachs* decision, *supra.*[18]

Our reading of the Pennsylvania authorities discloses that, in this respect, Pennsylvania law parallels that of New York.[19] In addition, the ambiguity between Clauses 3 and 6 requires extension of coverage in the instant case.

We believe the Supreme Court of Pennsylvania would reach the conclusion expressed here. Other issues raised by the parties do not require consideration.[20] Accordingly, the judgment of the district court will be affirmed.

Judge Van Dusen, concurring in this opinion, believes the result is required primarily because of the conflict between Clauses 3 and 6, as pointed out at pp. 14 ff. of the opinion, with the para-graph beginning: "It will be immediately noted that the provisions of Clause 3, read in conjunction with those of Clause 6, . . . create an ambiguity which to us seems irreconcilable."

---

**18.** An annotation discussing the problems arising from air trip insurance is presented at 29 A.L.R.3d 766. *See particularly* § 8.

**19.** *See generally,* Calamari, Duty to Read—A Changing Concept, 43 Fordham L.Rev. 341, 361 (1974).

**20.** These issues include plaintiff's contentions: (1) that exchange of tickets is immaterial to risk and, therefore, liability under Pennsylvania law; (2) that defendants are bound by the construction of their policy in Rosen, *supra,* where pertinent provisions were not revised following Rosen; (3) that discrimination between those who exchange tickets and those who do not is prohibited by 40 P.S. § 761; and (4) that the exchange requirement is unreasonable and arbitrary and, therefore, void under Pennsylvania law.